**GREENPEACE, American Oceans Campaign, and Sierra Club, Plaintiffs,**

v.

**NATIONAL MARINE FISHERIES SERVICE, and William M. Daley, in his official capacity as Secretary of the Department of Commerce, Defendants,**

**At–Sea Processors Association, United Catcher Boats, Aleutians East Borough, and Westward Seafoods, Inc., et al., Intervenor–Defendants.**

No. C98–492Z.

United States District Court, W.D. Washington, at Seattle.

July 19, 2000.

Todd D. True, EarthJustice Legal Defense Fund, Seattle, WA, Eric Paul Jorgensen, Janis Searles, EarthJustice Legal Defense Fund, Juneau, AK, Peter Van Tuyn, Jack K. Sterne, Trustees for Alaska, Anchorage, AK, for Greenpeace, American Oceans Campaign, Sierra Club.

Marc Slonim, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, WA, Michael AD Stanley, Juneau, AK, for Aleutians East Borough, The Aleutians East Borough.

Brian C. Kipnis, U.S. Attorney's Office, Seattle, WA, Charles R. Shockey, U.S. Department of Justice, Land and Natural Resources Division, Washington, DC, Michael J. Robinson, Anthony P. Hoang, U.S. Dept of Justice, Gen. Litigation Sec.—Environment Div., Washington, DC, Lyn Jacobs, U.S. Department of Justice, Environmental & Natural Resources, Washington, DC, for National Marine Fisheries Service, William M. Daley.

James Alexander Smith, Jr., Smith & Hennessey, Seattle, WA, George J. Mannina, Jr., Gary C. Adler, O'Connor & Hannan, Washington, DC, for Westward Seafoods Inc., Wards Cove Packing Company, North Pacific Processors Inc., Nelbro Packing Company, Unisea Inc., Peter Pan Seafoods Inc., Kodiak Salmon Packers, Inc., Alyeska Seafoods Inc., Western Alaska Fisheries Inc., Kanaway Seafoods Inc., Royal Viking Inc, Morning Star LP, Great Pacific Limited Partnership, Alaskan Command Company, Pacific Knight LLC, City of Unalaska.

Linda Rae Larson, Heller Ehrman White & McAuliffe, Seattle, WA, for United Catcher Boats.

Christopher S. McNulty, Mundt MacGregor, Seattle, WA, Eldon V.C. Greenberg, Garvey, Schubert & Barer, Washington, DC, for At–Sea Processors Association.

Claire M. Gilchrist, Seattle, WA, Kenneth C. Powers, Anchorage, AK, for Sergei Vakhrin, North Pacific, Russian Far East Fisheries Film Studio, Olga Cherniagina, Kamchatka League of Independent Scientists, Pacific Environment and Resources Center.

Richard A. Smith, Smith & Lowney, PLLC, Seattle, WA, for National Wildlife Federation, International Marine Mammal, Project of Earth Island Institute, Humane Society of the United States, Defenders of Wildlife.

Jay H. Zulauf, Christopher S. McNulty, Mundt MacGregor, Seattle, WA, Eldon V.C. Greenberg, Garvey, Schubert & Barer, Washington, DC, for At–Sea Processors Association.

## ORDER

ZILLY, District Judge.

### I. INTRODUCTION

The Gulf of Alaska (GOA) and the Bering Sea/Aleutian Islands region (BSAI), collectively referred to as the North Pacific ecosystem, is home to the largest commercial fishery in the United States. The ecosystem is also home to the western Steller sea lion, which in 1990 was listed under the Endangered Species Act (ESA) as a threatened species and in 1997 was classified as endangered. Greenpeace, American Oceans Campaign, and the Sierra Club (plaintiffs) contend the North Pacific groundfish trawl fisheries are harmful to the endangered Steller sea lion and seek to partially enjoin these fisheries under the ESA. *See* docket no. 390. Specifically, plaintiffs request that the Court enjoin all groundfish trawl fishing within designated western Steller sea lion critical habitat until the National Marine Fisheries Service (NMFS) issues a legally adequate biologi-

cal opinion addressing the combined, overall effects of the North Pacific groundfish fisheries on the Steller sea lion and its critical habitat. Plaintiffs' motion follows this Court's recent decision holding NMFS in continuing violation of the ESA until such time as NMFS completes a comprehensive biological opinion adequately analyzing the full scope of the North Pacific groundfish Fishery Management Plans. *See Greenpeace v. National Marine Fisheries Service*, 80 F.Supp.2d 1137 (W.D.Wash.2000). NMFS opposes plaintiffs' motion, as do the intervenor-defendants representing the fishing industry (collectively "Industry").

For the reasons stated in this opinion, the Court concludes that plaintiffs are entitled to the injunctive relief they request. Accordingly, the Court GRANTS plaintiffs' motion for a partial injunction of the North Pacific groundfish fisheries and will enjoin all groundfish trawl fishing within Steller sea lion critical habitat in the oceans of the BSAI and GOA west of 144˝W longitude, as such critical habitat is defined by regulation, until further order of this Court. The injunction shall go into effect at noon Pacific time, August 8, 2000.

## II. BACKGROUND AND PROCEDURAL HISTORY

Under the Magnuson–Stevens Fishery Conservation and Management Act (Magnuson Act), the North Pacific Fishery Management Council (Council) prepares Fishery Management Plans (FMPs) that regulate all aspects of the commercial fisheries in the GOA and BSAI. The full suite of management measures that comprise the FMPs constitute a "framework" plan governing the overall conduct of these fisheries. The Magnuson Act's implementing regulations also require the Council and NMFS to make certain discrete management decisions annually. These annual measures involve setting the harvest specifications for the fishing year, including total allowable catch limits (TACs) for target and prohibited species, and apportioning these quotas among various sectors of the fisheries and between fishing seasons. *See generally Greenpeace*, 80 F.Supp.2d at 1139–41, 1145–46. Both the FMPs and the authorization of the yearly fisheries constitute "agency action" under the ESA.

The Endangered Species Act imposes on all federal agencies a duty to "insure" that agency actions do not "jeopardize" the continued existence of any threatened or endangered species or result in the destruction or "adverse modification" of the critical habitat of such species. *See* 16 U.S.C. § 1536(a)(2). A species is "endangered" within the meaning of the ESA when it is in danger of extinction throughout all or a significant portion of its range. *See* 16 U.S.C. § 1532(6). The designated "critical habitat" of a species is intended to protect those geographical areas occupied by the species which contain the essential physical and biological features necessary for the survival and recovery of the species. *See* 16 U.S.C. §§ 1532(3), 1532(5)(A)(i). *See also* 58 FR 45269 (rule designating critical habitat for the Steller sea lion).

"Jeopardize" means:

> to engage in any action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species.

50 C.F.R. § 402.02. "Adverse modification" means:

> a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species. Such alterations include, but are not limited to, alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat critical.

50 C.F.R. § 402.02

To effectuate the ESA's duty to avoid jeopardy and adverse modification, the

ESA requires the "action" agency to consult with an "expert" agency to evaluate the effects a proposed agency action may have on a listed species.[1] If the action agency determines through preparation of a biological assessment or informal consultation that the proposed action is "not likely to adversely effect" listed species or critical habitat, formal consultation is not required so long as the expert agency concurs. 50 C.F.R. § 402.14(b). If, however, the agency cannot affirmatively state that the proposed action is not likely to adversely affect listed species or critical habitat, formal consultation is mandatory. *See* 50 C.F.R. § 402.14(a) (formal consultation triggered when an agency determines that its actions "may affect" listed species or critical habitat). *See also Bennett v. Spear,* 520 U.S. 154, 158, 117 S.Ct. 1154, 137 L.Ed.2d 281, 292 (1997) (formal consultation required where action "may adversely affect" a listed species); *Pacific Rivers Council v. Thomas,* 30 F.3d 1050, 1054 n. 8 (9th Cir.1994) (outlining consultation procedures).

The final product of a formal consultation is a biological opinion ("BiOp") which sets forth the expert agency's conclusions regarding jeopardy and adverse modification. *See* 16 U.S.C. § 1536(a)(2). If jeopardy or adverse modification is found, the expert agency must propose "reasonable and prudent alternatives" ("RPAs"), which are the proposed alternative measures by which the action can proceed without causing jeopardy or adverse modification. *See* 16 U.S.C. § 1536(b)(3)(A).

Since 1990, when the Steller sea lion was first listed as threatened, NMFS's Office of Sustainable Fisheries has engaged in both informal and formal consultation with NMFS's Office of Protected Resources to evaluate the effect of the North Pacific groundfish fisheries on the Steller sea lion and other marine mammals. These consultations have varied in scope from addressing the overall effects of the groundf-

ish FMPs in their entirety, to addressing the effects of discrete amendments to the FMPs or the effects of the annual fisheries. *See Greenpeace,* 80 F.Supp.2d at 1140–41.

In December of 1998 NMFS issued two biological opinions addressing the potential effects of the North Pacific groundfish fisheries on the Steller sea lion. The first opinion, (hereinafter "BiOp1"), dealt specifically with the pollock and Atka mackerel fisheries. The second opinion, (hereinafter "BiOp2"), dealt with the overall effects of the FMPs in their entirety. Both of these opinions were challenged by plaintiffs in this litigation.

In BiOp1, NMFS reached a "no jeopardy" conclusion with respect to the mackerel fishery and a "jeopardy" conclusion with respect to the pollock fishery. This Court upheld both of these conclusions under the ESA. However, the Court ruled that the RPAs adopted by the Council and approved by NMFS with respect to the pollock fishery were arbitrary and capricious. The Court remanded for preparation of revised RPAs. *See Greenpeace v. National Marine Fisheries Service,* 55 F.Supp.2d 1248 (W.D.Wash.1999). In September of 1999, the Court denied plaintiffs' motion to enjoin the pollock fisheries pending issuance of the revised RPAs. *See* Transcript of Proceedings, September 16, 1999, docket no. 292. In October of 1999, NMFS issued Revised Final Reasonable and Prudent Alternatives (RFRPAs) on the pollock fishery.

In BiOp2, NMFS analyzed the effects of its entire fishery management scheme on the Steller sea lion. However, in January of 2000, this Court ruled that BiOp2 was legally inadequate under the ESA because it was not a comprehensive opinion and failed to analyze the full scope of the FMPs. *See Greenpeace,* 80 F.Supp.2d at 1150. NMFS has re-initiated consultation on the FMPs but has yet to issue the

---

1. In this case NMFS's Office of Sustainable Fisheries is the "action" agency and NMFS's Office of Protected Resources is the "expert" agency.

required biological opinion. At present, NMFS expects this "comprehensive consultation" to be completed and a comprehensive biological opinion issued by October 31, 2000, prior to the authorization of the year 2001 fisheries. *See* Rosenberg Decl. at 13–14 (attached to Defendant's Response, docket no. 401). In the meantime, the year 2000 North Pacific groundfish fisheries are continuing. A significant portion of these fisheries occurs within designated Steller sea lion critical habitat.

## III.  FACTS

The Court has carefully reviewed the Administrative Record, as well as the Declarations submitted by the parties as part of this motion. The Court sets forth in Appendix A of this opinion the facts established in the Administrative Record which form the basis for this opinion. The following is a brief synopsis of these facts.

The Steller sea lion is the only extant species of the genus *Eumatopias,* a genus which is at least 3–4 million years old. Scientists believe the Steller sea lion has evolved exclusively in the North Pacific ecosystem. Although the full range of the Steller sea lion occurs along the entire North Pacific Rim, its major population center is in western Alaska in the Gulf of Alaska and the Aleutian Islands. Since the late 1970's, the Steller sea lion has experienced a severe population decline within the Alaskan portion of its range. Overall, the western population of Steller sea lions has declined by 80% over the last 30 years. The worst decline has occurred in the Steller sea lion's core population centers in western Alaska. As a consequence of these drastic declines in population, NMFS has concluded that "there is a high risk that the western population of Steller sea lions could become extinct in the foreseeable future if their decline is not abated and their rate of increase is not improved immediately." Appendix A § 5. Population viability analyses conducted in 1994 and 1996 indicated that the next 20 years may be crucial to the survival of the Steller sea lion.

The Bering Sea/Aleutian Islands and Gulf of Alaska regions, where Steller sea lions have experienced their greatest population decline, is also an area where very large commercial fisheries have developed. Concurrent with the decline of the Steller sea lion Alaska groundfish fisheries underwent a period of unprecedented growth. Between the 1950's and the 1990's, the total annual removal of groundfish in Alaskan waters increased from about 27,000 metric tons to 2.1 million metric tons, an increase of over 7,500 percent.

Although scientists are unable to precisely determine the impact of the fisheries on Steller sea lion survival, several important facts are undisputed: 1) the primary scientific hypothesis for the decline in sea lion population is lack of food availability, resulting in "nutritional stress;" 2) the fisheries remove hundreds of millions of pounds of fish every year from the oceans that have traditionally supported the major sea lion population centers; 3) the fisheries operate at times and in areas where sea lions forage for food; and 4) many of the fish species targeted by the fisheries are important sea lion prey. These basic facts have lead NMFS to conclude that the fisheries may negatively impact Steller sea lions by "competing" for prey resources.

"Exploitative" competition for prey occurs on a "global" scale when fisheries remove large quantities of prey, thereby reducing prey availability to sea lions. Competition for prey may also occur on a local level, resulting in so called "localized depletions" of prey. Localized depletions of prey occur where the fisheries are concentrated at times and in areas where sea lions forage. For example, analyses have shown that repeated trawling in the same locations can lead to severe localized depletions of prey.

The fisheries may also affect sea lion foraging success through "interactive competition." Interactive competition occurs when normal sea lion foraging patterns are

disrupted by the presence and movement of vessels and fishing gear in the water, prime foraging areas are abandoned because of fishing activities, and prey schools are altered by trawling, thereby reducing the effectiveness of sea lion foraging. For example, scientists believe that the strategies used by fishing vessels likely alter the schooling dynamics of target schools by reducing their size, density, and persistence. As a consequence, because sea lion foraging patterns are more likely adapted to the normal schooling behavior of prey, trawling may disadvantage sea lion foraging success by not only reducing prey availability, but also by altering the normal aggregation of schools and disrupting sea lion foraging patterns.

Formal efforts to begin protecting the Steller sea lion began in 1990 when NMFS listed the Steller sea lion as a threatened species throughout its entire range in the United States. In those areas in which the North Pacific groundfish fisheries operate, designated Steller sea lion critical habitat includes all "major" sea lion rookeries and haulouts. In the areas west of 144˜W in which the endangered western population occurs, critical habitat includes approximately 40 rookeries and 82 haulouts and the oceans within 20 nautical miles of these rookeries and haulouts, as well as three special at-sea foraging areas.[2] Prey resources are the most important feature of aquatic critical habitat.

Subsequent to listing the Steller sea lion as a threatened species, NMFS instituted various measures to protect prey resources within sea lion critical habitat. Generally, these included either year round or seasonal trawl exclusion zones around certain principal rookeries and haulouts. Following NMFS's conclusion in BiOp1 that the pollock fishery as then proposed would likely jeopardize the survival and recovery of the Steller sea lion, additional measures to restrict the pollock fishery were implemented in 1999.[3] Despite these protective measures, a considerable amount of critical habitat remains open to fishing. Most year round all-trawl exclusion zones extend out to only 10 nautical miles. Most other exclusion zones are seasonal and restrict only specific fisheries. Other fisheries are not restricted at all. In the Bering Sea/Aleutian Islands fisheries, over 350,000 metric tons of pollock, 79,000 metric tons of Pacific cod, and 29,000 metric tons of Atka mackerel were caught within critical habitat in 1999. These figures demonstrate that a significant percentage of the annual catch occurs in critical habitat (36%, 50%, and 52%, respectively). Although the overall tonnage taken in the Gulf of Alaska fisheries for these fish species in 1999 was less than in the Bering Sea, with the exception of mackerel, the figures in the Gulf of Alaska represent a greater percentage of the annual catch (83%, 61%, and 34% respectively).

Despite conservation measures, the most recent Steller sea lion counts taken by NMFS in 1997 and 1998 show that the decline in sea lion numbers continues. Counts taken from "trend" rookeries Alaska-wide (i.e., including counts of eastern and western populations), indicate an overall decline of approximately 24% between 1990 and 1998. As such, since the initial listing of the Steller sea lion as a threatened species, it has lost an additional one-fourth of its population. Based on continued population declines, in 1997 NMFS classified the Steller sea lion into two distinct population segments east and west of 144˜W longitude and reclassified the western population as endangered.

Plaintiffs' present motion seeks to enjoin all trawl fishing within critical habitat west of 144˜W longitude (i.e., the area in which the endangered western population occurs). The trawl fisheries that would be affected include: pollock, Atka mackerel,

---

2. *See* BiOp 2000 at 68.

3. A list of the measures taken to protect sea lion critical habitat is found in the Rosenberg Declaration at §§ 12–29, docket no. 401.

Pacific cod, various species of sole and rockfish, Pacific Ocean perch, and flatfish. For the June–December 2000 period, the combined TAC remaining to be taken by these fisheries in critical habitat totals 346,407 metric tons, representing over 25% of the remaining catch in the BSAI and GOA overall.

## IV. STANDARD FOR INJUNCTIVE RELIEF UNDER ESA SECTION 7(a)

The traditional test for permanent injunctive relief is actual success on the merits, irreparable injury, and inadequacy of legal remedies. *Sierra Club v. Penfold,* 857 F.2d 1307, 1318 (1988). This test requires a court to balance any competing claims of injury and the effect granting or withholding injunctive relief would have on the parties and the public interest. *Id.* The traditional standard, however, is not the test for injunctive relief under the ESA. *See TVA v. Hill,* 437 U.S. 153, 194, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978); *National Wildlife Federation v. Burlington Northern R.R.,* 23 F.3d 1508, 1511 (9th Cir.1994); *Sierra Club v. Marsh,* 816 F.2d 1376, 1383 (9th Cir.1987). Under the ESA, Congress has "foreclosed the exercise of the usual discretion possessed by a court of equity." *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). The "language, history, and structure" of the ESA demonstrates "beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *TVA v. Hill,* 437 U.S. 153, 174, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). Under the ESA, the balance of the hardships has already been struck in favor of endangered species. *See id.* at 194, 98 S.Ct. 2279. Moreover, where injury to an endangered species is threatened, legal remedies are necessarily inadequate. *See Weinberger,* 456 U.S. at 314, 102 S.Ct. 1798 (only injunctive relief can vindicate the objectives of the ESA to preserve endangered species). *See also Amoco Prod. Co. v. Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)

(environmental injury by its nature can seldom be remedied by money damages).

■ Nevertheless, these cases do not obviate the need to assess the potential threat of injury to a listed species before deciding whether to grant an injunction under the ESA. *See Burlington Northern,* 23 F.3d at 1511. Federal courts are not obligated to grant an injunction for every violation of the law. *Hill,* 437 U.S. at 193, 98 S.Ct. 2279. In order to be entitled to injunctive relief, the plaintiff "must make a showing that a violation of the ESA is at least likely in the future." *Burlington Northern,* 23 F.3d at 1511. Accordingly, injunctive relief under the ESA is generally mandated where the moving party 1) has had or can likely show "success on the merits," and 2) makes the requisite showing of "irreparable injury."

### 1. Success on the Merits

■ It is undisputed that plaintiffs have had success on the merits. As detailed in this Court's recent ruling, the ESA requires NMFS to prepare a comprehensive biological opinion equal in scope to the North Pacific groundfish FMPs. NMFS's failure to do so goes beyond a technical or *de minimis* violation, but constitutes a substantial violation of the procedural requirements of the ESA. *See Thomas v. Peterson,* 753 F.2d 754, 764 (9th Cir.1985) (failure to prepare preliminary biological assessment is substantial procedural violation). In the absence of a completed comprehensive biological opinion NMFS has not, and cannot, insure that continued fishing in designated critical habitat will not result in harm to endangered Steller sea lions. Under these circumstances, continued implementation of the FMPs and, therefore, authorization of the yearly fisheries under those FMPs, constitutes a continuing violation of the ESA. *See Greenpeace,* 80 F.Supp.2d at 1150. Plaintiffs undoubtedly have had "success on the merits." The more difficult question for the Court in this case is the standard to be applied to determine whether plaintiffs

have met their burden of showing "irreparable injury."

### 2. *Irreparable Injury*

The parties argue that the requirement of "irreparable injury" is only met under section 7 of the ESA where the conduct sought to be enjoined poses "a reasonably certain threat of imminent harm" to the listed species. This test was developed by the Ninth Circuit in a line of cases dealing with ESA section 9, which prohibits the "taking" of a listed species. *See Burlington Northern*, 23 F.3d at 1510–11; *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 784–88 (9th Cir.1995); *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1064–66 (9th Cir.1996); *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 924–25 (9th Cir.2000). However, this is not the test to be applied under ESA section 7.

The seminal case for injunctive relief under ESA section 7 in the Ninth Circuit is *Thomas v. Peterson*, 753 F.2d 754 (9th Cir.1985). In that case, the Ninth Circuit held that "[g]iven a substantial procedural violation of the ESA in connection with a federal project, the remedy must be an injunction of the project pending compliance with the ESA." 753 F.2d at 764. The "substantial procedural violation" at issue in *Thomas* was the Forest Service's failure to prepare a biological assessment to determine the potential effects of construction of a logging road and related timber sales on the endangered Rocky Mountain Gray Wolf. In holding that an injunction pending compliance with the ESA was the proper remedy, the *Thomas* Court relied on a line of prior Ninth Circuit NEPA cases for the proposition that "irreparable damage is presumed to flow from a failure to properly evaluate the environmental impact of a major federal action." *Thomas*, 753 F.2d at 764 (citing *Save Our Ecosystems v. Clark*, 747 F.2d 1240, 1250 (9th Cir.1984) and *Friends of the Earth, Inc. v. Coleman*, 518 F.2d 323, 330 (9th Cir.1975)). The *Thomas* Court reasoned that "the strict substantive provisions of the ESA

justify *more* stringent enforcement of its procedural requirements, because the procedural requirements are designed to ensure compliance with the substantive provisions." *Id.* (emphasis original). The Court concluded that if a project is allowed to proceed without substantial compliance with those procedural requirements, "there can be no assurance that a violation of the ESA's substantive provisions will not result." *Id.* Because such a result would be "impermissible" under the ESA, the *Thomas* Court squarely rejected the district court's holding that the "party asserting a violation [of section 7] of the Endangered Species Act has the burden of showing the proposed action would have some prohibited effect on an endangered species or its critical habitat" in order to be entitled to injunctive relief. *Id.* at 764–65. Rather, the *Thomas* Court pointed out that under section 7:

> Congress has assigned to the agencies and to the Fish and Wildlife Service the responsibility for evaluation of the impact of agency actions on endangered species, and has prescribed procedures for such evaluation. Only by following the procedures can proper evaluations be made. *It is not the responsibility of plaintiffs to prove, nor the function of the courts to judge, the effect of a proposed action on an endangered species when proper procedures have not been followed.*

*Id.* at 765 (emphasis added). Accordingly, the *Thomas* Court concluded that the only burden on plaintiffs "is to show that the circumstances triggering the procedural requirement exist, and that the required procedures have not been followed." *Id.* In so holding, the Court specifically distinguished caselaw under ESA section 9 which placed the burden on plaintiffs to prove a "taking" had occurred under that section before being entitled to injunctive relief. *Id.* In short, the *Thomas* Court rejected the very standard the parties now urge this Court to adopt.

To the extent the parties rely on *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) (overrul-

ing *Save Our Ecosystems v. Clark* ) for the proposition that a showing of harm must always be made (i.e., that *Thomas* is no longer good law), such reliance is misplaced. In *Sierra Club v. Marsh*, 816 F.2d 1376, 1384 (9th Cir.1987), the Ninth Circuit expressly rejected the argument that *Amoco* implicitly overruled *Thomas*. To the contrary, the *Marsh* Court concluded that *Amoco* implicitly *affirmed Thomas*. *Marsh*, 816 F.2d at 1384. The Court reiterated that Congress' intent to preserve endangered species by insuring against jeopardy and adverse modification could only be effectuated by requiring "substantial compliance" with the ESA's procedural requirements. *Id.* Accordingly, the Court concluded "the Sierra Club is entitled to injunctive relief if the [Army Corps of Engineers] violated a substantive *or procedural* provision of the ESA." *Id.* (emphasis added).[4]

Nevertheless, citing to *Marsh* among other cases, the Industry asserts that there is a distinction between substantive and procedural violations of the ESA, and that there is no *per se* rule that all agency actions must be enjoined pending completion of consultation. *See* Defendant–Intervenors' Response at 4–7, docket no. 402. The Industry asserts that injunctions are only proper under section 7(a) to prevent substantive violations of the ESA. According to the Industry, this requires proof that harm to the species is likely and imminent. *See id.* at 10.

The Industry correctly observes that where an agency has not fulfilled its substantive duty to "insure" against jeopardy or adverse modification, injunctive relief is mandatory under section 7. However, there is simply no basis in the facts or outcome of *Marsh*, nor any other case cited by NMFS or the Industry, for the proposition that substantive compliance with ESA section 7 is only called into doubt upon proof of likely future harm.[5] A substantial procedural violation necessarily implicates compliance with the substantive requirements of the ESA because the consultation process is the only means by which the substantive mandate of the statute is met. *Thomas*, 753 F.2d at 765. It is precisely for this reason that *Thomas* rejected the notion that a party seeking injunctive relief for a substantial procedural violation of ESA section 7 has the burden of showing a prohibited effect on a listed species, i.e., harm. *See id.* As both *Thomas* and *Marsh* make clear, the whole purpose of a section 7 consultation is to insure against such harm before it occurs. Thus, to the extent *Marsh* distinguishes between substantive and procedural violations, the distinction is only important where the procedural violation does not implicate the agency's affirmative obligation to insure against jeopardy and ad-

---

**4.** *Thomas* was recently cited as controlling authority for injunctive relief under section 7(a) in *Natural Resources Defense Council, Inc. v. U.S. Dept. of Interior*, 1995 WL 299409 (9th Cir.1995).

**5.** Despite NMFS's and the Industry's argument to the contrary, section 7(d) does not require a different result. Although section 7(d) by its terms presupposes that certain agency actions may proceed pending completion of the consultation process, *see e.g., Pacific Rivers Council v. Thomas*, 936 F.Supp. 738, 746 (D.Idaho 1996), section "7(d) does not amend section 7(a) to read that a comprehensive biological opinion is not required before initiation of agency action so long as there is no irreversible or irretrievable commitment of resources." *Conner v. Burford*, 848 F.2d 1441, 1445 n. 34 (9th Cir.1988). "[T]he ESA does not require that the government halt all

activities, *unless intermediate activities violate s[ection] 7(a)(2),*" but "permits *non-jeopardizing* activities, so long as the [s]ection 7(d) mandate is not violated." *North Slope Borough v. Andrus*, 486 F.Supp. 332, 357 (D.D.C.) (emphasis added), *aff'd in part, rev'd in part on other grounds*, 642 F.2d 589, 611 (C.A.D.C. 1980) (affirming the district court's section 7(d) determination because the research activities at issue "were non-jeopardizing activities"). *Compare also e.g., Conner v. Burford*, 848 F.2d 1441, 1455, 1458 (9th Cir.1988) (rejecting agency's no jeopardy determination as improper and enjoining all further activity until consultation process complete); *Friends of the Earth v. U.S. Navy*, 841 F.2d 927, 933–34 (9th Cir.1988) (under ESA section 7 balance has been struck in favor of environmental review *prior* to agency action).

verse modification before initiating agency action.[6]

Nor do the Ninth Circuit's section 9 "taking" cases require a different conclusion. As the Ninth Circuit noted in *Burlington Northern,* injunctive relief is proper upon "a showing that a violation of the ESA is at least likely in the future." 23 F.3d at 1511. Under ESA section 9, "harm" to a species is a term of art which falls within the regulatory definition of "take." *See id.* at 1512; *Rosboro Lumber,* 50 F.3d at 784. Thus, under ESA section 9, a showing of future "harm" is required in order to prove that "a violation of the ESA is at least likely in the future". *See Burlington Northern,* 23 F.3d at 1511.[7] Unlike section 9 which is strictly prohibitory in nature, section 7 imposes a "rigorous" affirmative duty on federal agencies to "insure" that their actions do not result in jeopardy or adverse modification and prescribes the procedures for compliance. *See Marsh,* 816 F.2d at 1385. This duty must be fulfilled before initiation of agency action. *See Conner,* 848 F.2d at 1453, 1455; *Friends of the Earth,* 841 F.2d at 933–34.

Applying either the *Thomas* standard, or the standard proposed by the parties, this Court concludes that plaintiffs are entitled to the injunctive relief they request.

## V. APPLICATION OF THE STANDARD FOR INJUNCTIVE RELIEF TO THIS CASE

### A. *The Thomas Standard*

In the present case, NMFS's procedural violation directly implicates its duty to in-

sure against jeopardy and adverse modification. By authorizing the yearly fisheries in the absence of an adequate, comprehensive biological opinion, NMFS has failed to "insure" that these fisheries will not likely jeopardize the Steller sea lion or adversely modify its critical habitat. This failure is not merely a technical oversight. In this Court's prior opinion invalidating NMFS's conclusion that its overall management scheme would not jeopardize Steller sea lions, the Court noted that NMFS had failed to critically analyze whether and how core management measures such as the processes for deriving acceptable biological catch, overfishing, and total allowable catch impacted endangered species such as the Steller sea lion. Proper evaluation of these core management measures is crucial because they provide the primary basis for NMFS's conclusion that catch levels are sufficiently conservative to protect sea lion food availability. BiOp2 also failed to analyze whatsoever whether and how the management scheme as a whole, or the combined overall effects of the numerous fisheries regulated by the FMPs impacted Steller sea lion survival and recovery. Similarly, BiOp2 failed to include any analysis to determine whether the large catch levels permitted within critical habitat were consistent with conservation of the Steller sea lion. As this Court noted then, even though some of the target species may not individually constitute a major prey source for sea lions, this does not mean the cumulative, overall impact of these fisheries is insignificant. *See Green-*

---

**6.** In *Marsh,* project activities occurring outside critical habitat were not likely to adversely affect the species or its habitat. Pursuant to formal consultation the project had already been modified to remove direct and indirect adverse effects on the listed species. 816 F.2d at 1379. With respect to these non-jeopardizing activities, the Court applied the proscriptions of section 7(d). *Id.* at 1389. However, the Court enjoined under section 7(a) all activities occurring within critical habitat because the agency had failed to take the necessary action to "insure" against jeop-

ardy and adverse modification. *See id.* at 1395, 1389.

**7.** To the extent *Burlington Northern* suggests harm must always be shown, *see* 23 F.3d at 1512, it is at odds with *Thomas, Marsh,* and *Conner.* Importantly, none of the Ninth Circuit's section 9 cases discuss the Ninth Circuit's section 7 caselaw. Moreover, in *Thomas,* the Ninth Circuit specifically rejected section 9 caselaw as the standard for injunctive relief under section 7. *See Thomas,* 753 F.2d at 764–65.

*peace*, 80 F.Supp.2d at 1148–50. Nor do NMFS's conclusions with respect to the effects of individual fisheries relieve it of its duty to evaluate the combined, overall impacts of these fisheries prior to authorizing them. *See* 50 C.F.R. § 402.14.

In short, NMFS is unable at present to conclude that the overall effects of these numerous fisheries, or its core management scheme, are not likely to adversely effect Steller sea lions. NMFS cannot validly authorize continued fishing within Steller sea lion critical habitat until it meets its substantive obligations under the ESA. Under *Thomas*, an injunction pending compliance must be the remedy.

### B. The "Reasonably Certain Threat of Imminent Harm" Standard

Even applying the parties' proposed standard under which plaintiffs bear the burden of proving that on-going trawl fishing in Steller sea lion critical habitat presents a "reasonably certain threat of imminent harm," the Court concludes that the standard is met and an injunction is warranted.

In the present context, "harm" must be defined as jeopardy or adverse modification as those terms are defined by the ESA. Thus, plaintiffs would be entitled to injunctive relief under the parties' proposed standard if they can show with reasonable certainty that the trawl fisheries threaten to appreciably diminish the likelihood of the survival or recovery of Steller sea lions in the wild by reducing their reproduction, numbers, or distribution (jeopardy), or threaten to appreciably diminish the value of critical habitat for sea lion foraging, rest, and reproduction (adverse modification).[8] Based on the Administrative Record alone, the Court concludes continued trawl fishing in sea lion critical habitat threatens to appreciably diminish the value of critical habitat as a prey resource for sea lions.

It is undisputed that the western Steller sea lion is on the brink of extinction. *See* Appendix A §§ 4, 5, 12, 13. The primary scientific hypothesis for the precipitous decline in Steller sea lion numbers is lack of prey availability, resulting in "nutritional stress." Appendix A § 15. Although other factors may play a part, fisheries related effects cannot be excluded as a contributing factor in the sea lion population decline. Appendix A § 17. In order to abate the trend towards extinction, NMFS listed the Steller as a protected species under the ESA and designated critical habitat. The primary feature of aquatic critical habitat, and the single most important purpose for its designation, is to provide a sufficient prey base to sustain the survival and recovery of the Steller sea lion in the wild. Appendix A § 10. Despite the purpose for which critical habitat was designated, and despite continuing Steller sea lion population declines, the North Pacific groundfish fisheries have for many years continued to remove very large quantities of prey from within Steller sea lion critical habitat. In 1999, for example, over 350,000 metric tons of pollock, 79,000 metric tons of pacific cod, and 29,000 metric tons of Atka mackerel were caught within critical habitat in the BSAI. These figures demonstrate that a significant percentage of the annual catch of these fisheries is taken in critical habitat (36%, 50%, and 52%, respectively). Although less tonnage was taken by these three fisheries in the GOA in 1999, with the exception of mackerel, the figures in the GOA represent a greater percentage of the annual catch (83%, 61%, and 34% respectively). These figures do not include the catch taken in the numerous other groundfish fisheries that operate within Steller sea lion critical habitat. Appendix A §§ 37, 38. For the 2000 fisheries, the Court has not been informed as to the total catch permitted to be taken in

---

**8.** Because the fisheries are presently on-going, any threat they present is necessarily imminent.

critical habitat for the entire year. However, the Court is informed that from June–December 2000 the catch yet to be taken in critical habitat by the trawl fisheries is 287,447 metric tons in the BSAI and 58,960 metric tons in the GOA, together representing over 25% of the total remaining allowable catch. Appendix A § 39. This fishing effort will necessarily require a significant presence of vessels and gear operating in the waters of Steller sea lion critical habitat.

NMFS has identified the numerous potential negative effects this large fishing effort likely has on sea lion foraging success. The evidence in the Administrative Record demonstrates that these large fisheries threaten to appreciably diminish the value of critical habitat as a prey resource for Steller sea lions through "exploitative" and "interactive" competition for fish. *See* Appendix A §§ 20, 21, 23, 27. For example, a reduction in the absolute quantum of fish affects the availability of prey and is one mechanism by which the fisheries compete with sea lions and likely diminish the value of critical habitat as a prey resource. Appendix A §§ 21, 27. On a local level, a trawl net not only reduces the absolute quantum of prey in a particular school, likely creating temporary "localized depletions" of prey, but also likely alters the schooling dynamics of target schools by affecting their density, size and persistence, thus further disadvantaging sea lion foraging and exaggerating the fisheries' competitive effects. Appendix A §§ 27, 33. Similarly, the presence and movement of vessels and gear in the waters of critical habitat may disrupt sea lion foraging patterns and result in the abandonment of prime foraging areas. Appendix A § 26.

Based on the Administrative Record, the Court concludes the potential negative effects of the fisheries on the Steller sea lion have been demonstrated with reasonable scientific certainty. Thus, although the actual effects of the fisheries and the efficacy of mitigation measures are uncertain, the significant and demonstrated potential negative effects of these large fisheries constitute a clear *threat* to appreciably diminish the value of critical habitat for Steller sea lions.

The Court rejects NMFS's and the Industry's assertion that despite the large fishing effort plenty of fish are left in the sea for sea lions. In this regard NMFS points out that the catch yet to be taken in critical habitat this year is but a small percentage of the total estimated biomass in the ecosystem as a whole. However, these figures do not take into account the catch that has already been taken this year, nor the fact that system-wide estimates cannot reliably describe local conditions in critical habitat.

The Court also rejects NMFS's assertion that because scientific uncertainties prevent conclusive determination of the fisheries' actual effects on Steller sea lions, plaintiffs' claims of harm are therefore speculative. This argument is contrary to NMFS's own prior conclusions on the matter. In BiOp1, NMFS specifically relied upon the very scientific analysis currently before the Court, which NMFS now conveniently characterizes as speculative, in order to conclude that the pollock fishery likely jeopardized Steller sea lion survival and recovery. At the time, this Court rejected the Industry's argument that NMFS's jeopardy conclusion was not supported by sufficient scientific evidence. *See Greenpeace,* 55 F.Supp.2d at 1261–62. Rather, the Court concluded that BiOp1 "relied on significant evidence that the pollock fisheries were competing with the Steller sea lions for prey...." *Id.* at 1261. While acknowledging that the scientific data was not "conclusive," the Court noted that the standard did not require conclusive proof, but only that decisions under the ESA be based on the best scientific data available. *See id.* at 1261–62. The Court concluded that based on the best available scientific evidence, NMFS had properly concluded "that jeopardy and adverse modification were likely to occur." *Id.* at 1262. Similarly, in the present con-

text, proof of harm need not be conclusive. *See Burlington Northern,* 23 F.3d at 1512. If NMFS's scientific conclusions were sufficiently certain to conclude that actual jeopardy and adverse modification were likely, NMFS cannot now be heard to say that this same evidence is insufficiently certain to conclude that such harm is unlikely.

Finally, the Court disagrees with the Industry's argument that plaintiffs' motion constitutes a "back door" attack on the RFRPAs and BiOp 2000, and that granting the relief they request would be inconsistent with this Court's prior decision upholding BiOp1's no jeopardy conclusion with respect to the mackerel fishery. This Court's conclusion with respect to the mackerel fishery was taken *prior* to concluding the FMPs as a whole were not in compliance with the ESA. Similarly, the RFRPAs were issued prior to this Court's FMP decision. Both BiOp1 (mackerel conclusion) and the RFRPAs rely for their conclusions on core fishery management measures which this Court has subsequently found invalid under the ESA. For example, both opinions assume that overall TAC levels for each fishery are safe for sea lions. However, as this Court later pointed out, NMFS itself has concluded that the processes for deriving the acceptable biological catch and the yearly TAC for each fishery "cannot ensure that the amount of food available to sea lions will not be diminished by fishing." *Greenpeace,* 80 F.Supp.2d at 1148; Appendix A § 29. By relying on these same management measures, BiOp 2000 merely repeats, rather than corrects, the errors of prior opinions.

Similarly, one of the major issues that NMFS has failed to properly analyze is the combined, overall effects these fisheries may have on sea lions. In none of its current biological opinions does NMFS explain how the various groundfish fisheries and fishery management measures interre-

late and how the overall management regime may or may not affect Steller sea lion survival and recovery. Each individual fishery does not occur in a vacuum. Thus, conclusions with respect to a single fishery are insufficient to insure that the combined effects do not cause jeopardy or threaten harm.[9] *See e.g., Greenpeace,* 80 F.Supp.2d at 1149–50; 50 C.F.R. § 402.14.

## VI. EXPERT OPINIONS

Challenges to biological opinions issued under the ESA are generally limited to the administrative record. In this case the administrative process is incomplete and the biological opinion upon which NMFS relies has been held inadequate to support NMFS's conclusions. Therefore, in order to show that continued fishing in critical habitat will not likely harm Steller sea lions, NMFS resorts to proof outside the record. However, as the *Thomas* Court aptly put it, it is not "the function of courts to judge[ ] the effect of a proposed action on endangered species when proper procedures have not been followed." 753 F.2d at 765. Particularly troubling is the apparent conflict of interest in which opposition to the plaintiffs' motion places NMFS: essentially advocating a "no jeopardy" conclusion which it has yet to reach through the formal, objective consultation process. Environmental reviews of the kind at issue here "must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made." *Metcalf v. Daley,* 214 F.3d 1135, 1142 (9th Cir.2000). Where, as here, NMFS resorts to proof outside the Administrative Record to defend actions for which it has yet to complete formal environmental review, the specter of a foregone conclusion haunts the proceedings. Nevertheless, the parties agree that the Court may consider the opinions of the experts.

**9.** For this reason, the Court's prior ruling denying injunctive relief with respect to the

pollock fishery is also distinguishable from the present situation.

With respect to absolute reductions in the availability of sea lion prey, plaintiffs' expert Dr. Lavigne states: "The removal of fish by a fishery from a marine ecosystem reduces (over some temporal and spatial scale) the abundance (number and biomass) of fish in that system. Any reduction in the absolute abundance of a fish population may, in turn, reduce its availability to other predators, such as sea lions, in the vicinity." Because the North Pacific groundfish fisheries undisputedly remove large quantities of sea lion prey from areas essential for sea lion foraging, Dr. Lavigne concludes the fisheries likely reduce prey availability to the detriment of sea lions. Dr. Lavigne also concludes that temporal and spatial dispersion of the fisheries does not ensure that the fisheries do not threaten harm through the removal of large quantities of prey because fishery effects cannot be isolated to the time and place of fishing. Further, Dr. Lavigne criticizes NMFS's reliance on global stock assessments as a method of avoiding depletions of prey. According to Dr. Lavigne, stock assessments are of limited utility and provide no assurance that prey is not being depleted on a local level. 1st Lavigne Decl at § 29; Second Lavigne Decl. at §§ 12–22.

With respect to the combined, overall affects of the fisheries, plaintiffs' expert, Dr. Lavigne, states that the "synergistic and cumulative effects of the removal of these important sea lion prey species, together with other groundfish fisheries, are necessarily more significant than any one of the fisheries considered individually." Dr. Lavigne suggests that the combined effects of removing multiple sea lion prey species from critical habitat likely reduces the availability of alternative prey species, thereby amplifying likely adverse effects on sea lion foraging behavior. Dr. Lavigne also states that the presence of vessels in sea lion habitat increases disturbance effects on sea lions and prey species. Thus, according to Dr. Lavigne, the combined and cumulative effects of groundfish trawling are almost certainly greater than the individual effects of any one fishery, and are likely quite substantial. Dr. Lavigne draws his conclusions based on various factors including the fact that fished areas may take days, weeks, or months to recover. Thus, for example, the effects of the fisheries cannot be isolated in time and are likely to linger and be compounded or amplified by the occurrence, at a later date, of a second or third fishery. 1st Lavigne Decl. at § 46. 2nd Lavigne Decl at 13–15; BiOp 2000 at 7 (Pl.Ex. 1).

In contrast, NMFS's expert Dr. Andrew Rosenberg concludes that the fisheries do not pose a threat of harm to Steller sea lions and disputes Dr. Lavigne's conclusions. Dr. Rosenberg states that "the low exploitation rates, high recruitment rates, relatively short life-histories, and migratory patterns of these fish species throughout the BSAI and GOA should allow these species to recover relatively quickly from fishery operations under the existing protective regime which temporally and spatially disperses the fishery." NMFS's and the Industry's experts point out that total groundfish biomass is at an all time high. According to the Industry's expert Steven Hughes, during the last 25 years, the same period over which severe sea lion declines have been experienced, the groundfish biomass in the BSAI and GOA have increased and been maintained at their all-time highest levels in modern history. The density of BSAI groundfish per unit of continental shelf area is the highest of any area in the world and is many times greater than other areas in the world where populations of related marine mammal species are at high levels and increasing. In contrast, the density levels of groundfish in Southeast Alaska where Steller sea lion populations are reportedly on the rise, are a small fraction of the BSAI densities. *See* Hughes Decl. at 2 (attached to Intervenors' Response, docket no. 402). According to Dr. Rosenberg, it is temporal and spatial dispersion of the fisheries, as opposed to the gross quantity of prey available after harvest that is of primary con-

cern when evaluating the potential harm the fisheries pose to the Steller sea lion. Rosenberg Decl. at §§ 41–42, 59–60.

NMFS's and the Industry's experts also take issue with Dr. Lavigne's conclusion that the combined effect of the fisheries is necessarily greater than the effects of individual isolated fisheries. Dr. Rosenberg states that by dispersing the fishing effort among multiple stocks, the health of each stock is maintained, which in turn insures a healthy diversity of prey available to sea lions. Dr. Rosenberg posits that if, by conservatively harvesting an array of stocks, the essential health and availability of each stock is maintained, then the overall management strategy has insured a variety of prey will be available on a local basis, or on a scale consistent with the foraging patterns of sea lions. "The sum total of effects then, does not necessarily have to be greater than the effects of any single fishery." Rosenberg Decl. at § 40. Similarly, Dr. Dayton Alverson rejects Lavigne's conclusions as unsupported by the weight of the scientific evidence. Alverson Decl. (attached to Intervenors' Response, docket no. 402).

The parties have not challenged the qualifications of each other's experts and the Court concludes the opinions and conclusions of all the experts are credible. The opposing expert opinions, therefore, raise material issues of fact regarding the potential harm posed by the fisheries. However, based on the particular factual and procedural stance of this case, where significant, potentially harmful activity is presently on-going in the face of a substantial, unremedied procedural violation of the ESA, the "institutionalized caution" mandated by section 7 strikes the balance in favor of the endangered Steller sea lion. *See Marsh,* 816 F.2d at 1389. The Court takes no position on the ultimate validity of any expert conclusions upon which NMFS may rely in completing the consultation process. However, for the purposes of this motion the Court concludes that plaintiffs' expert's opinion provides further evidence that continued fishing in critical habitat threatens to appreciably diminish the value of critical habitat as a prey resource for sea lions. The conclusions of plaintiffs' expert are generally in accord with the scientific evidence and NMFS's own expert conclusions contained in the Administrative Record. *Compare e.g.,* Appendix A §§ 21, 27, 29, 33. The fact that other experts provide contrary opinions does not preclude injunctive relief in the context of this case.

## VII. CONCLUSION AND ORDER

The Court concludes that plaintiffs have had "success on the merits" and have met their burden of proving "irreparable harm" under *Thomas.* In the alternative, the Court concludes that plaintiffs have proven that continued trawl fishing in critical habitat poses "a reasonably certain threat of imminent harm" to Steller sea lions and their critical habitat. Accordingly, the Court GRANTS plaintiffs' motion for a partial injunction of the North Pacific groundfish fisheries and will enjoin all groundfish trawl fishing within Steller sea lion critical habitat in the oceans of the BSAI and GOA west of 144W̄, as such critical habitat is defined by regulation, until further order of this Court.[10] The injunction shall go into effect at noon Pacific time, August 8, 2000. Plaintiffs shall serve and file a proposed form of injunction consistent with this Order by July 28, 2000. Defendant NMFS and the Industry shall file any written objections to the proposed form of injunction by August 4, 2000. The Court will thereafter promptly enter an injunction which shall be effective as of August 8, 2000 pursuant to this Order.

IT IS SO ORDERED.

10. By regulation, the aquatic critical habitat of the endangered western population of Steller sea lion includes the oceans within 20 nm of major rookeries and haulouts and three special at-sea foraging areas. *See* 58 FR 45269; BiOp 2000 at 68.

APPENDIX A

1. The Steller sea lion (*Eumatopias jubatus*) is the only extant species of the genus *Eumatopias,* a genus which is at least 3–4 million years old. Over these last 3–4 million years, scientists believe the Steller has evolved entirely in the North Pacific ecosystem. BiOp 2000 at 48 (Pl. Exhibit 1).

2. The Steller sea lion is found along the entire North Pacific Rim from the Channel Islands of Southern California to northern Japan, and north into the Bering Sea and along the eastern shore of the Kamchatka Peninsula. BiOp 2000 at 48 (Pl. Ex.1).

3. Although the full range of the Steller sea lion occurs along the entire North Pacific Rim, the major population center is in western Alaska in the Gulf of Alaska and the Aleutian Islands. A 1989 survey indicates that 15% of the total Steller sea lion population is found in Russia, 9% in British Columbia, 6% in California and Oregon, and about 70% in Alaska. BiOp 2000 at 48; 58 FR 45269 (final rule designating critical habitat).

4. Since the late 1970's, the Steller sea lion has experienced a severe population decline within the Alaskan portion of its range. From the late 1970s to 1996, the Steller sea lion population declined by about 85% in the Gulf of Alaska and by 72% in the Bering Sea and Aleutian Islands. The worst decline has been experienced in the Steller sea lion's core population centers in western Alaska. Overall, the western United States population of Steller sea lion has declined by 80% over the last 30 years. BiOp1 at 58 (S1–55); BiOp 2000 at 60–61, 68 (Pl. Exhibit 1).

5. As a consequence of the drastic declines in the western population of Steller sea lion, NMFS has concluded that "there is a high risk that the western population of Steller sea lions could become extinct within the foreseeable future if their decline is not abated and their rate of increase is not improved immediately." Population viability analyses conducted in 1994 and 1996, indicated that the next 20 years may be crucial to the survival of the western population of Steller sea lion. Within this time frame the number of adult females in the Kenai–to–Kiska region could drop to less than 5000. Extinction rates for rookeries or clusters of rookeries could increase sharply in the next 40 to 50 years, and extinction for the entire Kenai–to–Kiska region could occur in the next 100–120 years. BiOp1 at 60, 102 (S1–55); BiOp 2000 at 63 (Pl.Ex.1).

6. In 1990, in the face of growing evidence of precipitous sea lion population declines, NMFS listed the Steller sea lion throughout its entire range in the United States as threatened. BiOp 2000 at 84 (Pl. Exhibit 1).

7. In 1993, NMFS designated critical habitat. In those areas in which the North Pacific groundfish fisheries operate, designated Steller sea lion critical habitat includes all "major" sea lion rookeries and haulouts. In the areas west of 144$\overline{\text{W}}$ (i.e., the area in which the endangered western population occurs), critical habitat includes the oceans within a 20 nautical mile radius of these major rookeries and haulouts. Areas so designated are listed in Tables 1 and 2 of 58 FR 45269, 45278–79. *See also* BiOp1 at 61–64 (S1–55); BiOp 2000 at 63–66 (Pl.Ex.1).

8. Designated critical habitat also includes three special at-sea foraging areas designated as the Shelikof Straight Area, the Bogoslof Area, and the Seguam Pass Area. 58 FR

45269 (designating critical habitat); BiOp2 2000 at 64 (Pl.Ex.1).

9. The physical and biological features essential to sea lion critical habitat include those features that support reproduction, foraging, rest, and refuge. Terrestrial habitat is relatively easily identified based on use patterns. These areas are chosen by sea lions because they offer refuge from terrestrial predators and from the elements, and because they are suitable for reproductive activities and are in close proximity to prey resources. BiOp2 2000 at 64–65 (Pl. Ex.1); BiOp1 at 62–63 (S1–55).

10. Prey resources are the most important feature of aquatic critical habitat. The marine environment may be used for a number of other reasons, e.g., rafting and social interaction, but foraging is the most important sea lion activity that occurs when sea lions are at sea. The 20 nm mile radius around major haulouts and rookeries was designated as critical habitat based on mean trip distance by lactating females in summer. However, while studies indicate that summertime foraging by post-partum females generally occurs in the relatively shallow waters within 20 nm of rookeries, the data also demonstrates that sea lions have the ability to forage at locations far removed from their rookeries and haulouts (up to hundreds of nautical miles), and at great depths (e.g., 250 meters). BiOp2 2000 at 65 (Pl.Ex.1); BiOp1 at 63 (S1–55); RFRPAs at 23–24 (S5–38); 58 FR 45269 at 45279.

11. The three at-sea foraging areas were designated as critical habitat based on foraging studies, historical observations, and current observations of the distribution of sea lion prey. These areas historically have supported dense aggregations of mackerel and/or spawning pollock and contain, or are adjacent to, major sea lion rookeries and haulouts. 58 FR 45269 at 45271 (rule designating critical habitat); BiOp 2000 at 65 (Pl.Ex.1); BiOp1 at 63 (S1–55).

12. In 1997, due to continuing Steller sea lion population declines, NMFS classified the Steller sea lion into two distinct population segments east and west of 144W and reclassified the western population as endangered.

13. The most recent Steller sea lion counts taken by NMFS in 1997 and 1998 show that the decline in sea lion numbers continues. Counts taken from "trend" rookeries Alaska-wide (i.e., including counts of eastern and western populations), indicate an overall decline of approximately 7% between 1996 and 1998, and 24% between 1990 and 1998. As such, since the initial designation of the Steller as a threatened species, it has lost an additional one-fourth of its population. *See* Sease, J.L. and T.R. Loughin, 1999: Aerial and Land Based Surveys of Steller sea lions in Alaska, June and July of 1997 and 1998 at iii. (Pl.Ex.2).

14. Although a number of factors may have contributed to the decline of the Steller, for example predation, disease, toxic substances, oil, gas and mineral development, and commercial and subsistence harvest, NMFS has concluded these factors are either negligible or cannot fully account for the severe declines experienced over the last 30 years. *See* BiOp 2000 at 68–74 (Pl.Ex.1).

15. The primary scientific hypothesis for the reduction in sea lion population is lack of food availability, both quantity and quality, i.e. nutritional stress. The available evidence suggests that lack of available prey is a

significant problem that is contributing to sea lion population declines. Most of the data on the proximate causes of sea lion population decline point to reduced juvenile survival as a significant causal agent. Indications are that decreased juvenile survival is due to a lack of food post-weaning and during the winter/spring of the first year. BiOp 2000 at 65, 91–92 (Pl. Ex.1); BiOp1 at 63–64 (S1–55); 58 FR 45269 at 45271 (rule designating critical habitat).

16. A possible factor in the availability of quality sea lion prey is natural climactic changes in atmospheric and ocean conditions. Studies suggest that the BSAI and GOA ecosystems shift between at least two types of climactic regimes which can be characterized as either "warm" or "cold" depending on atmospheric and ocean temperatures. A well documented shift from a cold to warm regime in 1976–77 was associated with dramatic changes in the structure and composition of the invertebrate fish communities as well as the distribution of individual species in the North Pacific Ocean and Bering Sea. Researchers have associated warm years with increases in certain species of fish. Increases in broadly distributed groundfish species such as pollock, Pacific cod, arrowtooth flounder and Pacific halibut have been associated with a decline in abundance and a change in distribution of such short lived pelagic species as capelin. One theory proposes that changes in the trophic structure observed in the BSAI and GOA regions resulted in the dominance of pollock. Pollock are thought to be a low quality prey for sea lions and, consequently, the western population of sea

lions has not been able to sustain itself on this low quality prey. *See* BiOp 2000 at 72–74 (Pl.Ex.1); BiOp1 at 71–73 (S1–55).

17. NMFS has concluded that "the existence of a strong environmental influence on sea lion trends does not rule out the possibility of a significant fisheries-related effect" on sea lions. Sea lions have apparently lived through many regime shifts in the few million years they have existed. "What may be different about this most recent shift is the coincident development of extensive fisheries targeting the same prey on which sea lions depend during warm regimes." "The cause of sea lion decline need not be a single factor. To the contrary, strong environmental influences on Bering Sea, Aleutian Islands, and Gulf of Alaska ecosystems could increase the sensitivity of sea lions to fisheries or changes in those ecosystems resulting from fisheries." BiOp 2000 at 74, 90–91 (Pl.Ex.1).

18. The relationship between commercial fisheries and the ability of Steller sea lions to obtain adequate food is not fully understood. What is known, however, is that the BSAI and GOA region where sea lions have experienced the greatest population decline is also an area where large commercial fisheries have developed. Concurrent with the decline of the Steller sea lion, "Alaska groundfish fisheries underwent a period of unprecedented growth." Between the 1950s and the 1990s, the total annual removal of groundfish from Alaskan waters increased from about 27,000 metric tons per year to about 2.1 million metric tons per year (an increase of over 7,500 percent). In addition, it is undisputed that fisheries target important sea lion prey resources (i.e., fish) at times and in areas

where sea lions forage. BiOp2 2000 at 83, 91 (Pl.Ex.1); 58 FR 45269 at 45271.

19. Numerous fish species targeted in the North Pacific groundfish fisheries are also important prey to the Steller sea lion. Although it is believed that pollock and Atka mackerel are the dominant prey of the Steller, it is the general scientific consensus that a more diverse prey assemblage is likely better for the sea lion. Diversity may be necessary to insure sea lions are getting sufficient amounts of calories and essential nutrients, or to ensure that total available prey is adequate even if the availability of certain prey is variable and sometimes inadequate. BiOp 2000 at 55, 57, 65, 80, 91 (Pl.Ex.1); BiOp1 at 52 (S1–55).

20. Because the fisheries target fish species that are also targeted by sea lions, the greatest potential negative impact of the fisheries on the sea lion are biological effects resulting from "competition" for prey between the fisheries and the sea lion. *See* BiOp2 2000 at 68, 74, 91 (pl.Ex. 1).

21. "Exploitative competition" occurs when fisheries remove prey and thereby reduce prey availability to sea lions. The most obvious negative example of exploitative competition is overfishing a fish stock. Overfishing results in the removal or reduction of a prey species' participation in the ecological interactions that comprise the ecosystem. Such change could affect Steller sea lions, as well as other marine predators. BiOp 2000 at 68, 97 (Pl.Ex.1).

22. In an effort to prevent overfishing, each year NMFS estimates the total biomass for each fish species either targeted by the fisheries or caught as by-catch. Using various applicable formulas, NMFS then estimates the overfishing level and the Acceptable Biological Catch level and derives a total allowable catch (TAC). Because the science is not certain, the acceptable biological catch and the TAC are intended to be a conservative estimate of the amount of fishing that can be done without overfishing the stock. These figures have been derived for the 2000 fisheries. BiOp 2000 at 3–8, 137–141 (Tables 2 & 3) (Pl.Ex.1).

23. Exploitative competition may also occur on a local level resulting in so called "localized depletions" of prey. Such localized depletions may occur where the fisheries are concentrated spatially and temporally and where the selection of prey by the fisheries and sea lions overlap. Significant factors that may affect the occurrence of localized depletions include the concentration of fisheries in time, concentration of the fisheries in space, the size of targeted fish species, and the depth at which fishing occurs. BiOp 2000 at 74–79; 97–99 (pl.Ex. 1); BiOp1 at 17–19, 99–104.

24. With respect to depletions of prey on local scales, the fisheries have undergone significant changes over the last several years, particularly with respect to the pollock and mackerel fisheries, the dominant prey species targeted by sea lions. In its December 3, 1998 biological opinion (BiOp1) NMFS analyzed the potential effects of the mackerel and pollock fisheries through 2002. The opinion concluded that the mackerel fishery was not likely to jeopardize the survival or recovery of the Steller sea lion or adversely modify its critical habitat, but that the pollock fishery would result in jeopardy and adverse

modification. With respect to the mackerel fishery, the "no jeopardy" conclusion was based on measures to disperse the mackerel fisheries in time between seasons and in space among areas inside and outside critical habitat, eventually reaching a 40%–60% split of fishing inside and outside critical habitat. BiOp1 at 20–21, 104 (S1–55); *Greenpeace v. National Marine Fisheries Service*, 55 F.Supp.2d 1248 (W.D.Wash.1999).

25. Changes have also been made in the way the pollock fisheries are prosecuted. These changes include establishment of a sea lion conservation zone, TAC limitations within this zone, closure of the entire Aleutian Islands area to pollock fishing, dispersing the fisheries in time between four rather than two seasons, closure of 52 haulouts in the BSAI and GOA, reduction in the Bering Sea catcher/processor fleet, and elimination of the "Olympic style" race for pollock in the catcher/processor sector of the Industry. RFRPAs at 11–12 (S5–38).

26. The fisheries may also affect sea lions through "interactive competition." Examples of interactive competition include disruption of normal sea lion foraging patterns by the presence and movement of vessels and gear in the water, abandonment of prime foraging areas by sea lions because of fishing activities, and the disruption of prey schools in a manner that reduces the effectiveness of sea lion foraging. BiOp 2000 at 79.

27. Analyses have shown that repeated trawling in the same locations can lead to severe localized depletions of prey. It is thought that the strategies used by fishing vessels likely alter the schooling dynamics of target schools by affecting their density, size and persistence. Because sea lion foraging patterns are more likely adapted to normal schooling behavior of prey, trawling may disadvantage sea lions not only through overall removal of prey (i.e., exploitative competition), but also through disruption of the normal aggregation of schools (i.e., interactive competition). BiOp 2000 at 79.

28. Despite the complex fishery management scheme, NMFS is unable to conclude with any degree of certainty whether its management processes independently, or the scheme as a whole, results in effective conservation of the Steller sea lion. It is also unknown what effect, if any, changes to the fisheries have had in eliminating or reducing potential negative impacts on Steller sea lions. *See e.g.*, RFRPAs at 19–20 (S5–38)

29. NMFS has concluded that the process it uses for determining total allowable catch levels "cannot ensure that the amount of food available to sea lions will not be diminished by fishing." NMFS has recognized that its overall management processes are "driven by fishing industry and economic considerations." As a result, "opportunities to explore biological management approaches to stabilize or enhance the ecosystem and declining species are not adequately pursued." NMFS has also recognized that the management process does not adequately incorporate broader ecosystem interactions in determining catch levels. Finally, global harvest rates are "not a good indicator of the harvest rate on local spatial and temporal scales important to sea lions." AR–34 at 15–17 (1996 FMP BiOp); RFRPAs at 20 (S5–38); *Greenpeace v. National Ma-*

rine Fisheries Service, 80 F.Supp.2d 1137, 1148 (W.D.Wash. 2000).

30. While the conclusion that the fisheries compete with sea lions for prey appears to be based on sound scientific reasoning, the information to conclusively determine the effect of the fisheries on sea lions has not been collected. Workshops that specifically addressed the effects of groundfish fisheries on food resources in the Aleutian Islands, Bering Sea, and Gulf of Alaska ecosystems were held by the Alaska Sea Grant in 1993 and the National Research Council in 1996, only to conclude that there is no conclusive evidence available to resolve the issue and associated questions. BiOp1 at 99 (S1–55); BiOp 2000 at 98 (Pl.Ex.1).

31. A number of scientific uncertainties confound conclusive resolution of fisheries related effects on sea lions. The best scientific and commercial data available at this time are insufficient to distinguish between the relative effects natural, oceanographic factors, and the relative effects human related factors, such as the fisheries, may have on the availability of prey for sea lions. BiOp 2000 at 66.

32. This lack of key information is a significant impediment to proper analysis of fishery caused effects and to determining the efficacy of measures designed to mitigate these effects. For example, the distribution of prey species within critical habitat is key to resolving whether and how "localized depletions" occur and whether such mitigation measures as temporal and spatial distribution of the fisheries are effective. However, prey species within critical habitat cannot be described in detail or with a demonstrated measure of confidence. Walleye pollock, Atka mackerel, Pacific cod, rockfish, herring, capelin, sand lance, other forage fish, squid, and octopus are important prey items found in Steller sea lion critical habitat, but scientists are not able to reliably describe the abundance, biomass, age structure, or temporal and geographic distribution of these species within critical habitat with sufficient clarity and certainty to understand how they interact with Steller sea lions or other consumers, including the fisheries. Atka mackerel may be one of the more easily characterized sea lion prey items, but the onshore and offshore movements of mackerel, their distribution inside and outside critical habitat or in the vicinity of rookeries and haulouts, the relation between eastern and western stocks, or the causes of apparent two and three-fold changes in abundance cannot be determined. Pollock appear to be considerably more dynamic, and their spatial and temporal patterns and presence within sea lion critical habitat is even more difficult to describe in a detailed or quantitative fashion. BiOp 2000 at 66; RFRPAs at 19–20 (S5–38).

33. While it is thought that the removal of a portion of a fish school by a trawl net must create at least a temporary localized depletion that results from a gap in the prey school, how long that gap persists and the responses of the remainder of the schooling prey are unknown. The school may aggregate again either quickly or over time, or it may disperse. Thus, while it is thought that the interactive effects of the fisheries on the availability of sea lion prey may exaggerate the competitive effects caused by the removal of prey, the overall effect

of interactive competition is unknown. BiOp 2000 at 79.

34. Sea lion foraging patterns are a central part of determining the effects of the fisheries on sea lion foraging success. The available information provides an emerging picture of sea lion foraging patterns. However, much remains to be learned. For example, scientific studies of sea lion foraging patterns are just beginning to characterize the diving depths and patterns of sea lions, and they are likely capable of foraging patterns not yet understood or anticipated. Information on the diving patterns of foraging sea lions is necessary to evaluate the relationship between such diving patterns, the depth at which the fishery fishes, and the movement of target species vertically in the water column. Similarly, while it is reasonable to assume that some overlap occurs in the size of prey targeted by the fisheries and by sea lions, the degree of overlap of sizes of groundfish taken by foraging sea lions and by the various groundfish fisheries is not known for most species. A better understanding of these interactions is necessary to properly understand the effect of the fisheries on sea lion foraging success. BiOp 2000 at 52, 57, 77 (Pl.Ex.1); RFRPAs at 23–24 (S5–38).

35. The *potential* negative effects of the fisheries on the Steller sea lion have been demonstrated with reasonable scientific certainty, although the *actual* effects and the efficacy of mitigation measures are uncertain.

36. For the 2000 fishery, additional trawl exclusion zones have been put into place. These exclusion zones have been chosen on the basis of sea lion counts at rookeries and haulouts to determine the relative importance of particular rookeries and haulouts. In the Bering Sea, exclusion zones generally extend out in a 20 nm radius from rookeries and haulouts. In the Gulf of Alaska, the exclusion zones are designated at 10 nm. Apparently this is because the continental shelf in the GOA is smaller and, thus, the typical sea lion foraging area is correspondingly limited. RFRPAs at 21–25 (S5–38). *See also* Rosenberg Decl. at 10, 17–18 (attached to Defendant's Response, docket no. 401); Maps Presented by NMFS for Oral Argument.

37. Despite these trawl exclusion zones, a considerable amount of critical habitat remains open to fishing. Most year round all-trawl exclusion zones extend out only to 10 nm. Most other exclusion zones are seasonal. Thus, a good deal of critical habitat remains open to fishing to all or some of the fisheries year round or seasonably. RFRPAs at 21–25 (S5–38). *See also* Rosenberg Decl. at 10, 17–18 (attached to Defendant's Response, docket no. 401); Map Presented by NMFS for Oral Argument.

38. In the Bering Sea/Aleutian Islands fishery, over 350,000 metric tons of pollock, 79,000 metric tons of Pacific cod, and 29,000 metric tons of Atka mackerel were caught within critical habitat in 1999. These figures demonstrate that a significant percentage of the TAC is taken in critical habitat (36%, 50%, and 52%, respectively). Although the overall tonnage taken in the Gulf of Alaska fisheries for these fish species in 1999 was less than in the Bering Sea, with the exception of mackerel, the figures in the Gulf of Alaska represent a greater percentage of the TAC (83%, 61%, and 34% respectively). A substantial portion

of the total catch in critical habitat is attributable to the trawl fisheries. *See* Plaintiffs' Exhibits 8 and 9, docket no. 392.

39. At the request of the Court, NMFS has provided the estimated catch that is yet to occur in critical habitat during the remainder of the season by the trawl fisheries. These figures demonstrate that the remaining estimated trawl catch in critical habitat for the 2000 fisheries is a significant percent of the total remaining TAC. Although NMFS points out that the remaining catch is but a small percentage of the total estimated biomass in the ecosystem as a whole, biomass figures do not take into account the catch that has already been taken this year, nor the fact that system-wide estimates cannot reliably describe local conditions in critical habitat. Standing alone, the total catch yet to be taken in critical habitat by the trawl fisheries is substantial in terms of absolute tonnage. The total yet to be taken in trawl fisheries in the BSAI is 287,447 metric tons and in the GOA is 58,960 metric tons, together representing over 25 percent of the total remaining allowable catch for the year. In other words, hundreds of thousands of pounds of fish remain to be harvested by the trawl fisheries in critical habitat this year. *See* Tables 1 and 2, docket no. 417.