**NATIONAL WILDLIFE FEDERATION,**
Great Bear Foundation, Plaintiffs–
Appellants,

v.

**BURLINGTON NORTHERN RAILROAD,**
INC., Defendant–Appellee.

No. 92–35595.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 13, 1993.

Decided May 5, 1994.

Thomas M. France, National Wildlife Federation, Missoula, MT, for plaintiffs-appellants.

J. Daniel Hoven, Browning, Kaleczyc, Berry & Hoven, Helena, MT, for defendant-appellee.

Before: GOODWIN, CANBY, and KOZINSKI, Circuit Judges.

Opinion by Judge GOODWIN.

GOODWIN, Circuit Judge:

The National Wildlife Federation and Great Bear Foundation (collectively referred to as "NWF") appeal the denial of their motion for a preliminary injunction in their action against Burlington Northern Railroad, Inc. ("BN") under the Endangered Species Act's ("ESA") citizen suit provision, 16 U.S.C. § 1540(g)(1).

NWF claims that BN violated the ESA by modifying grizzly bear feeding behavior through a series of accidental corn spills along BN tracks in northwestern Montana. NWF also alleges that BN violated the ESA when BN trains struck and killed seven grizzly bears, allegedly attracted to the food supply at the spill sites.

We agree that the bear fatalities constituted a prohibited "taking" within the meaning of the ESA.[1] We now must decide whether the NWF carried its burden of demonstrating enough likelihood of irreparable *future* injury to grizzly bears to justify judicial intervention in the form of an injunction. The district court held that NWF did not. We affirm.

---

1. In 1975, the U.S. Fish and Wildlife Service ("FWS") classified the grizzly bear as a "threatened" species under the ESA. *See* 40 Fed.Reg. 31,734–36 (1975). FWS regulations generally prohibit the taking of any species that has been classified as endangered or threatened. 50 C.F.R. §§ 17.21, 17.31. The statutory meaning of "take" is "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

## I.

In the winter of 1988–89, three Burlington Northern trains carrying grain derailed on a four-mile stretch of track south of Glacier National Park in northwestern Montana. A total of 104 cars derailed and spilled nearly 10,000 tons of corn over an area of steep rocky terrain. The massive corn spill created a new food source for bears, attracting grizzlies to the site to feed. By October 1990, seven grizzly bears in northwestern Montana had fatal encounters with BN trains. At least five of these bears were killed in the immediate vicinity of the corn spills. Two other grizzlies were killed by trains on other sections of BN tracks.

In 1991, NWF filed this suit in federal court, claiming that BN's acts constituted a "taking" of grizzly bears in violation of the ESA. NWF also contended that BN's rail operations, including the corn spills, were "harassing" or "harming" grizzlies and their habitat in violation of the ESA. NWF moved the court to enter an order requiring BN, among other things, to (1) reduce its operating speed around the derailment sites from 25 mph to 15 mph; (2) conduct a feasibility study to determine the possibility of equipping train locomotives with air bags or other bear protective devices; and (3) obtain a permit from the Secretary of Interior authorizing the incidental taking of grizzly bears.[2] NWF did not seek to enjoin BN's rail operations in northwestern Montana.

The district court found that BN had violated the ESA's broad prohibition against "taking" grizzly bears, but held that NWF had failed to establish "the possibility" of irreparable injury as a result of the BN's past violation of the ESA. The court found that although the derailments "did alter, to a certain extent, grizzly bear habitat," the attractiveness of the derailment sites as a food source had been "substantially minimized by subsequent cleanup efforts." Further, the

court found that the likelihood of future derailments had decreased since the BN had replaced the affected section of track and provided additional stabilization by installing concrete ties.[3] The district court denied NWF's motion for a preliminary injunction and for summary judgment, finding that the past violations of the ESA did not support prospective equitable relief.

## II.

 Appellate review of a decision to grant or deny a preliminary injunction is restricted to determining whether the district court abused its discretion or based its decision on an erroneous legal standard or clearly erroneous findings of fact. *Fund for Animals, Inc. v. Lujan,* 962 F.2d 1391, 1400 (9th Cir.1992); *Sierra Club v. Marsh,* 816 F.2d 1376, 1382 (9th Cir.1987). The district court's finding on the likelihood of irreparable harm is reviewed for abuse of discretion. *California ex rel. Van de Kamp v. Tahoe Regional Planning Agency,* 766 F.2d 1308, 1316 (9th Cir.1985).

### A. Preliminary Injunctions Under the Endangered Species Act

 Under the traditional test, a party is entitled to a preliminary injunction if it demonstrates: (1) a likelihood of success on the merits and a possibility of irreparable injury, or (2) the existence of serious questions on the merits and a balance of hardships tipping in its favor. *Fund for Animals,* 962 F.2d at 1400. These are not two independent tests, but the extremes of the continuum of equitable discretion. *Id.*

 This traditional test for preliminary injunctions, however, is not the test for injunctions under the Endangered Species Act. *Marsh,* 816 F.2d at 1383 (citing *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 174, 98 S.Ct. 2279, 2291, 57 L.Ed.2d 117 (1978));

---

**2.** The Secretary of the Interior may permit a taking of a protected species "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). Such takings cannot occur, however, until the applicant submits, and receives approval of, a conservation plan as outlined in § 1539(a)(2).

**3.** BN spent $9,640,800 to upgrade the track to decrease the possibility of future derailments. BN also spent $500,000 immediately after the three derailments to clean up the spill and replace the track.

*Friends of the Earth v. United States Navy,* 841 F.2d 927, 933 (9th Cir.1988). In cases involving the ESA, Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests. *Friends of the Earth,* 841 F.2d at 933 (quoting *Marsh,* 816 F.2d at 1383). The "language, history, and structure" of the ESA demonstrates Congress' determination that the balance of hardships and the public interest tips heavily in favor of protected species. *TVA,* 437 U.S. at 174, 98 S.Ct. at 2292; *Friends of the Earth,* 841 F.2d at 933; *Marsh,* 816 F.2d at 1383.

■■■ Nevertheless, these cases do not stand for the proposition that courts no longer must look at the likelihood of future harm before deciding whether to grant an injunction under the ESA. Federal courts are not obligated to grant an injunction for every violation of the law. *TVA,* 437 U.S. at 193, 98 S.Ct. at 2301. The plaintiff must make a showing that a violation of the ESA is at least likely in the future. *Cf. Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987) (in NEPA case, if injury to the environment *"is sufficiently likely,* [ ] the balance of harms will usually favor the issuance of an injunction") (emphasis added).[4]

## B. *Likelihood of Future Harm*

NWF alleges that BN will continue to take grizzly bears in violation of the ESA. To prevail, NWF must prove that there is a reasonable likelihood of future violations of the ESA; namely, of future harm to the grizzlies of northwestern Montana from grain spills. The district court found that NWF had failed to show such a likelihood. That finding is supported by the evidence.

■■■ It is undisputed that the operation of a modern railroad in bear country produces some risk to the dwindling population of grizzly bears in the region through which the railroad operates. It is also undisputed that the corn spill near BN's tracks heightened that risk. However, following completion of a major cleanup effort by BN, no bears have been hit by trains in the area of the corn spills in more than three years.[5]

Moreover, independent experts testified that the spills had not caused a significant impact on the grizzly bear habitat in the Northern Continental Divide Grizzly Bear Ecosystem (NCDGBE).[6] Keith Aune, a grizzly bear expert with the Montana Department of Fish, Wildlife, and Parks, said the impacts of the corn spill were of a "localized nature" and "cannot be characterized as significant." Aune also testified that grizzly bears have not been habituated over a long period of time to the corn spill area, reducing the likelihood that grizzly bears would continue to frequent the area once the food source was removed.[7]

Appellants argue that the district court failed to recognize the strong presumption of irreparable injury that exists in cases involving the ESA. Citing *Tennessee Valley Authority,* they contend that once a taking is

---

4. NWF alleges that the district court committed reversible error in relying on the traditional injunction test in denying NWF's motion for injunctive relief. On this record, however, any error was harmless. The district court pointed out the lack of a showing of future harm to the bears. By the proper standard, the attempted showing of future harm was wholly insufficient to support injunctive relief, even in light of the fact that the "balance of hardships and the public interest should tip heavily in favor of endangered species." *Marsh,* 816 F.2d at 1383.

5. Appellants tendered new evidence on appeal that another grizzly bear was killed on August 4, 1992, after being struck by an automobile on U.S. Highway 2, adjacent to the corn spill site. However, this fatal encounter with an automobile came two years after the trial court filed its decision. Facts not presented to the district court are not part of the record on appeal. *United States v. Elias,* 921 F.2d 870 (9th Cir.1990). Moreover, the connection between the automobile "taking" and the 1989 corn spill is too tenuous to require a remand for the court to reconsider this evidence.

6. The FWS has estimated that there are between 440 and 680 bears in the NCDGBE. FWS, 1990 Draft Grizzly Bear Recovery Plan.

7. The appellants submitted testimony from Dr. Chris Servheen, the Fish and Wildlife Service grizzly coordinator, that contradicted some of this testimony. We do not find, however, that the court's findings of fact to the contrary were clearly erroneous.

found, as here, the court must issue an injunction. The appellants expect more from the *TVA* case than its facts and holding will allow. *TVA* stated that courts are not mechanically obligated to grant an injunction for every violation of law. 437 U.S. at 173, 98 S.Ct. at 2291. Past takings are indeed instructive, especially if there is evidence that future similar takings are likely. However, in the instant case, the trial court found that future similar takings are not likely. This finding is not clearly erroneous.

In *TVA*, it was stipulated that completion of the Tellico Dam would have destroyed the critical habitat of the snail darter, resulting in the complete extinction of the endangered species. *Id.* at 171, 98 S.Ct. at 2290. Relying on this stipulation, the Supreme Court concluded that completion of the dam would have led to a *future* violation of the ESA, warranting injunctive relief. *Id.* at 172, 98 S.Ct. at 2290.

■ In the instant case, we find no clear evidence that the BN operations will result in the deaths of members of a protected species, as in *TVA*.[8] While we do not require that future harm be shown with certainty before an injunction may issue, we do require that a future injury be sufficiently *likely*.

■ Here, it is undisputed that BN does not intend to kill bears or to derail its grain cars at considerable cost to the company for both clean up and road repair, and at the risk of criminal and civil penalties.[9] Although NWF submitted testimony to the district court that bears continue to return to a food source once rewarded, the district court found that the attractiveness of the corn spill sites as food sources had been substantially minimized by BN's cleanup efforts. The fact that no bears have been killed by BN trains in three years supports an inference that the cleanup was effective. We cannot say that the district court clearly erred in finding that NWF failed to establish the likelihood of irreparable future injury.

### 1. Habitat Modification

Appellants also contend that BN's acts constitute an ongoing taking through habitat modification. They rely on *Palila v. Hawaii Dept. of Land & Natural Resources*, 852 F.2d 1106 (9th Cir.1988) (*Palila II* ). In that case, we held that the definition of "harm" in the ESA includes habitat degradation that could result in extinction. *Id.* at 1110–11. We specifically declined to "reach the issue of whether harm includes habitat degradation that merely retards recovery." *Id.* at 1110.

Our holding in *Palila II* was based on an interpretation of the Secretary's definition of harm, which reads:

"Harm" in the definition of "take" in the Act means an act which actually kills or injures wildlife. Such act may include *significant habitat modification or degradation* where it actually kills or injures wildlife by *significantly impairing* essential behavioral patterns, including breeding, feeding or sheltering.

50 C.F.R. § 17.3 (1987) (emphasis added).

■ Thus, in order to reach a similar finding of harm using our *Palila II* analysis,

---

8. We are not saying that a threat of extinction to the species is required before an injunction may issue under the ESA. This would be contrary to the spirit of the statute, whose goal of preserving threatened and endangered species can also be achieved through incremental steps. However, what we require is a definitive threat of future harm to protected species, not mere speculation.

In a recent case that also involved the grizzlies of northwestern Montana, the district court did not require a threat of *extinction* before granting a preliminary injunction. However, the court had evidence before it of certain future harm to grizzlies, not just speculative harm. *Fund for Animals v. Turner*, 1991 WL 206232, at *8–9, 1991 U.S.Dist. LEXIS 13426, at *25 (Sept. 27, 1991). In *Fund for Animals*, the federal defendants conceded that between three and nine grizzly bears would be killed in the sport hunt

planned for the fall season, which had been authorized under a federal regulation. The court invalidated the regulation and issued the injunction to stop the killing of the grizzlies. *Id.* at *8–9, 1991 U.S.Dist. LEXIS 13426, at *25.

9. The civil penalties provision of the ESA provides for penalties of $25,000 for knowing violations. 16 U.S.C. § 1540(a)(1) (1988). The ESA also carries criminal penalties for knowing violations, including prison terms or fines. *Id.* § 1540(b)(1). In addition, "[a]ny person who otherwise violates any provision of this chapter, or any regulation, permit, or certificate issued hereunder, may be assessed a civil penalty by the Secretary of not more than $500 for each such violation." *Id.* § 1540(a)(1).

the NWF would have to show *significant impairment* of the species' breeding or feeding habits and prove that the habitat degradation prevents, or possibly, retards, recovery of the species. NWF failed to make such a showing. As noted, the court heard the evidence of Keith Aune, who testified that the area of grizzly bear habitat affected by the grain spill is localized and did not significantly impact the feeding habits of grizzlies in the NCDGBE. Also, the Montana Department of Fish, Wildlife and Parks stated that the bear mortalities in the spill area "likely have had little long term overall effect" on the NCDGBE. Thus, the NWF has failed to show "*significant habitat modification or degradation* where it actually kills or injures wildlife by *significantly impairing* essential behavioral patterns, including breeding, feeding or sheltering."

### 2. *Mortality Quota*

Appellants contend that the district court, in holding that NWF had failed to show a threat of irreparable harm, erroneously relied on the fact that the "mortality quota" set by the FWS for grizzly bears in northwestern Montana had not been exceeded in the relevant years. The "mortality quota" had permitted a controlled sport hunt of grizzlies to relieve population pressures in certain geographical regions of Montana. Appellants note that the FWS regulation that established the mortality quota has been invalidated as inconsistent with the ESA and congressional intent behind the statute. *Fund for the Animals,* 1991 WL 206232, 1991 U.S. Dist. LEXIS 13426.[10]

However, the district court in the instant case did not rely *solely* on the grizzly bear mortality quota to hold that the appellants had not shown the likelihood of irreparable future harm. As discussed above, the court found that cleanup efforts had "substantially minimized" the attractiveness of the food source and that future train derailments were unlikely after BN replaced the affected section of track and provided additional stabilization.

On this evidence, we are unable to find that the court abused its discretion in holding that BN's train operations did not pose a threat of irreparable harm to the grizzly bears of the NCDGBE. As the court noted, the loss of seven grizzly bears caused by the corn spill does not establish the likelihood of irreparable harm in the future. Indeed, the record suggests that after spending nearly $10,000,000 in cleanup and rebuilding costs, BN will have as great an incentive as NWF to minimize bear mortality from its operations, with or without a court order.

### III.

Finally, NWF maintains that, because of BN's taking of grizzly bears and past violation of the ESA, this court must compel the BN to apply for an incidental taking permit. *See* 16 U.S.C. § 1539(a)(1)–(2). NWF essentially argues that once a taking has been established, the only way the BN's otherwise lawful rail operations may continue is for that entity to obtain an incidental taking permit.

The remedy available to private citizens under the ESA is injunctive relief. *See* 16 U.S.C. § 1540(g)(1)(A); *TVA,* 437 U.S. at 181, 98 S.Ct. at 2295. We need not decide whether injunctive relief at the demand of citizen plaintiffs includes the compulsory application for an incidental taking permit because we have found that the district court did not abuse its discretion in finding that injunctive relief is not warranted here. The judgment is

**AFFIRMED.**

---

10. The ruling invalidated 50 C.F.R. § 17.-40(b)(1)(i)(E). The U.S. Fish and Wildlife Service has now moved to repeal the rule through the Federal Register. *See* 57 Fed.Reg. 14378 (1992).