Richard Max STRAHAN, Plaintiff,

v.

Daniel HOLMES, Defendant.

Civil Action No. 07–10359–NMG.

United States District Court,
D. Massachusetts.

Jan. 30, 2009.

Steven S. Broadley, Posternak, Blankstein & Lund, Boston, MA, for Defendant.

Anton P. Giedt, United States Attorney's Office, Gordon M. Jones, III, Nixon Peabody LLP, Boston, MA, Srinath J. Govindan, U.S. Department of Justice, Washington, DC, for Interested Parties.

Joseph F. Shea, Nutter, McClennen & Fish, LLP, Boston, MA, for Movant.

## MEMORANDUM OF DECISION

GORTON, District Judge.

This is an action brought by *pro se* plaintiff, Richard Max Strahan ("Strahan"), against defendant Daniel Holmes ("Holmes") for the entanglement of an endangered humpback whale (*Megaptera novaeangliae*) in Holmes's fishing gear allegedly in violation of the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.* The parties appeared for a bench trial before this Court beginning on December 15, 2008, and ending on December 18, 2008. The Court now publishes its findings of fact and conclusions of law pursuant Fed.R.Civ.P. 52(a).

### I. *Findings of Fact*

1. Defendant Holmes is a commercial lobster fisherman who fishes in Cape Cod Bay and coastal waters within Massachusetts and federal jurisdiction.

2. Holmes has been licensed to fish continuously since 2006 by the Massachusetts Division of Marine Fisheries ("DMF") and the National Oceanographic and Atmospheric Administration ("NOAA"). He first obtained a Massachu-

setts lobstering license (for which he paid about $260) approximately 13 years ago at the same time that he purchased a boat and some other equipment.

3. Holmes's lobster trawls comprise a) two vertical lines with surface buoys that connect to a groundline, b) groundline that extends horizontally between adjacent lobster pots and c) about 20 lobster pots each connected to the groundline by a so-called gangion line. The maximum number of trawls he puts in the water at any one time is 40 (hence, a maximum of 800 pots).

4. All of Holmes's gear complies with Massachusetts and federal regulations. *See* 50 C.F.R. § 229.32; 322 C.M.R. § 4.13; *id.* § 12.03–.08. In addition, his gear is "whale safe", meaning it has weak-link buoys and sinking groundline.[1]

5. Holmes usually fishes between June and October each year on Stellwagen Bank, which is located in federal waters north of Cape Cod's Race Point. He usually fishes in Cape Cod Bay from July through December each year.

6. On or about July 31, 2006, Holmes deployed his gear in Stellwagen Bank.

7. On August 2, 2006, at about 7:00 a.m., a humpback whale was observed to be entangled in lobster fishing gear approximately nine miles west of Race Point, Provincetown, Massachusetts, near the mouth of Cape Cod Bay (42° 06.7′N, 70° 25.7′W). The whale was free-swimming to the west-north-west and appeared to have no injuries at that time. Approximately 200 feet of line connected to a pot at one point and a buoy at another was anchored in the whale's baleen.

8. The Center for Coastal Studies ("CCS"), a private non-profit organization for research, conservation and education in the coastal and marine environments, disentangled the whale from all of the gear by about 2:30 p.m. on the day of first observation and it swam away.

9. Some of the lobster gear removed from the whale was found by DMF to be inscribed with the Massachusetts fishing license number issued to Holmes. DMF delivered the gear to NOAA.

10. NOAA determined that the gear fully complied with Massachusetts and federal regulatory requirements.

11. Holmes did not file for an incidental take permit pursuant to 50 C.F.R. § 222.307 which, if issued, would have automatically exempted him from liability under the ESA. *See* 16 U.S.C. § 1539(a)(1)(B).

12. Whales are known to become entangled in fishing gear but the degree of risk created by gear is unclear:

a) Dr. Charles Mayo, a senior scientist at CCS, calls entanglement an "extraordinary" event.

b) Dr. Michael Moore, a senior research specialist from the Woods Hole Oceanographic Institution, on the other hand, finds that entanglement is "common" because about half of the whales observed in the Gulf of Maine (which includes Cape Cod Bay and Stellwagen Bank) have scarring produced by fishing rope rubbing on their skin. He also believes that it may be possible that more entanglements occur without producing any

---

**1.** A weak-link buoy is one that will break away from the vertical line to which it is attached when subjected to a certain level of pressure and which, upon breaking, produces a knotless end that is less likely to become lodged in whale baleen. 322 C.M.R. § 12.02(20). Sinking groundline is line connecting lobster pots that is weighted so that it does not float in the water column, which, if it did, might create a greater risk of entanglement.

scarring and, although gear poses a risk of entanglement to whales, that risk is not readily quantifiable.

c) Dr. Richard Pace III, a leader of the Atlantic Large Whale Take Reduction Team at NOAA's National Marine Fisheries Service, believes that there is no scientific way to calculate the risk factor for entanglements from the amount of gear and number of whales in a given geographical area.

13. The whale disentanglement team of CCS succeeds in disentangling whales from fishing gear about 70% of the time if its rescuers can reach the whale before sunset.

14. Entanglements are known to be potentially fatal to humpback whales but the risk of mortality posed by lobster fishing gear is unclear.

## II. *Conclusions of Law*

1. Humpback whales have been listed as endangered species. 50 C.F.R. § 17.11.

■ 2. Under Section 9 of the ESA, it is unlawful for any person to "take" an endangered species within the territorial sea of the United States either directly or indirectly. 16 U.S.C. § 1538(a)(1)(B); *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 700–02, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995). The taking of a single individual of a protected species is sufficient to trigger the protections of the ESA. *Loggerhead Turtle v. County Council of Volusia County*, 896 F.Supp. 1170, 1180 (M.D.Fla.1995).

3. The term "take" is defined in Section 3 of the ESA as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct". 16 U.S.C. § 1532(19).

a) "Harass" has been further defined to mean

an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering.

50 C.F.R. § 17.3.

b) "Harm" has been further defined to mean "actually kill [ ] or injure[ ]" which includes significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.

*Id.*

■ 4. The term "take" must be construed "in the broadest possible manner to include every conceivable way in which a person can take or attempt to take any fish or wildlife". *Strahan v. Coxe*, 127 F.3d 155, 160 (1st Cir.1997) (citation and internal quotation marks omitted); *see also Strahan v. Coxe*, 939 F.Supp. 963, 983 (D.Mass.1996), *aff'd in part, rev'd in part*, 127 F.3d 155 (citing cases).

■ 5. Holmes did not "harm" the whale that became entangled in his gear on August 2, 2006. Mere entanglement of a whale without any proof of injury does not fall within the meaning of "harm" as defined in the ESA regulations.

■ 6. Holmes also did not "harass" the whale under the meaning of that term as set forth in the ESA regulations. He cannot be found to have significantly disrupted its normal behavioral patterns because it was entangled for, at most, a little over two and a half days (taking into account the elapsed time between the setting of Holmes's pots and the liberation of the whale).

■ 7. Holmes did, however, "capture" a humpback whale when it became entangled in his lobster gear under the plain meaning of that term, which is not defined in the ESA or its accompanying regulations. In light of the broad definition afforded to "take", "capture", as a sub-component of "take" according to the regulations, must also be construed broadly. The Miriam Webster Dictionary defines "capture" as "take captive" or "gain control of especially by force". Although the whale eventually broke free of Holmes's trawl and was later disentangled from the gear stuck in its baleen, it was "taken captive" by Holmes's gear for at least some period of time.

8. Therefore, the Court concludes that Holmes violated Section 9 of the ESA when the humpback whale became entangled, and hence "taken", in his lobster gear. The fact that the taking was accidental is irrelevant. *Greenpeace Found. v. Mineta*, 122 F.Supp.2d 1123, 1136 (D.Haw. 2000).

■ 9. Under Section 11 of the ESA, this Court has jurisdiction to enjoin those, such as Holmes, who illegally take an endangered species. 16 U.S.C. § 1540(g)(1)(A). The Court is not required, however, to grant an injunction for every violation of the ESA. *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 193, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978).

■ 10. To justify the imposition of injunctive relief, the Court must find that
   a) the plaintiff prevailed on the merits;
   b) there is the potential for irreparable harm if the injunction is denied;
   c) the harm if no injunction issues outweighs the hardship to the defendant if enjoined; and
   d) the public interest would not be adversely affected by the issuance of an injunction.

*A.W. Chesterton Co. v. Chesterton*, 128 F.3d 1, 5 (1st Cir.1997).

■ 11. The Court concludes that the denial of the requested injunction is not likely to cause any irreparable harm in the future for the following reasons:
   a) the risk of future entanglement of whales in lobster fishing gear in general is uncertain;
   b) the risk of future entanglements in Holmes's gear in particular is even less certain; and
   c) whatever the risk of future entanglement posed by Holmes's gear, the risk of harm to the potentially entangled whales is even less because it is possible that an entangled whale will escape unscathed or be disentangled before suffering any injury.

12. Therefore, Strahan has failed to satisfy the second requirement for the issuance of a permanent injunction. *See Loggerhead Turtle*, 896 F.Supp. at 1181 (refusing to enter an injunction where a county's artificial beachfront lighting ordinance was not considered reasonably likely to "take" sea turtles without sufficient proof that the county's lights in particular disoriented sea turtle hatchlings); *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1512 (9th Cir.1994) (refusing to enter an injunction against a railroad where it was not sufficiently likely that grizzly bears would be killed by trains); *see also Am. Bald Eagle v. Bhatti*, 9 F.3d 163, 166 (1st Cir.1993) ("courts have granted injunctive relief only where petitioners have shown that the alleged activity has actually harmed the species or if continued will actually, as opposed to potentially, cause harm to the species").

■ 13. Furthermore, notwithstanding the fact that under the ESA the "balance of hardships … tips heavily in favor of

protected species", *Nat'l Wildlife Fed'n,* 23 F.3d at 1511, Strahan has failed to satisfy the third requirement for a permanent injunction. The hardship that would be imposed upon Holmes by an injunction, i.e. being prevented from pursuing his livelihood, far outweighs the relatively remote possibility of harm resulting from any future entanglements of whales in his fishing gear.

## ORDER

In accordance with the foregoing Memorandum of Decision, the defendant, Daniel Holmes, is determined to have committed a taking of a humpback whale in violation of 16 U.S.C. § 1538(a)(1)(B) but, because 1) there is no risk of irreparable harm to the humpback whale in the absence of an injunction and 2) the burden of an injunction upon Holmes outweighs its benefits, no injunction will enter.

**So ordered.**