### CENTER FOR BIOLOGICAL DIVERSITY, et al., Plaintiffs,

v.

### UNITED STATES FOREST SERVICE, et al., Defendants.

### No. CV–10–431–TUC–DCB.

United States District Court, D. Arizona.

Oct. 11, 2011.

Matt Kenna, Durango, CO, Marc D. Fink, Duluth, MN, for Plaintiffs.

Kristen Byrnes Floom, U.S. Department of Justice, Washington, DC, Rickey Doyle Turner, U.S. Department of Justice, Denver, CO, for Defendants.

## ORDER

DAVID C. BURY, District Judge.

Pending before the Court is Plaintiffs' Motion for Summary Judgment and Injunctive Relief. (Doc. 39.) The Court heard oral argument on September 12, 2011 and took the matter under advisement. The Court now rules.

## HISTORICAL BACKGROUND

Section 7(a)(1) of the Endangered Species Act (ESA) mandates that all federal agencies utilize their authorities to carry out programs for the conservation of endangered and threatened species listed pursuant to section 1533 of the ESA. 16 U.S.C. § 1536(a)(1). Section 7(a)(2) of the ESA requires each federal agency (action agency) to ensure that any action authorized, funded, or carried out by the agency is not likely to jeopardize listed species or result in the destruction or adverse modification of designated critical habitat 16 U.S.C. § 1536(a)(2). Action is defined broadly under the ESA to mean all activities or programs of any kind, authorized, funded, or carried out, in whole or in part, by federal agencies in the United States. 50 C.F.R. § 402.02 Action agencies are required to consult with the appropriate consulting agency whenever a federal action may affect a threatened or endangered species. 50 C.F.R. § 402.14. If the action agency concludes that its action is likely to adversely affect a listed species or critical habitat, formal consultation is required between the action agency and the consulting agency. § 402.14(a). Formal consultation concludes with the issuance of a Biological Opinion (BiOp) by the consulting agency, which assesses the likelihood of jeopardy to the species and the likelihood that the proposed action will result in the destruction or adverse modification of critical habitat. 50 C.F.R. § 402.14(c)-(e).

If the BiOp concludes that the action is not likely to jeopardize the existence of listed species and will not result in the adverse modification of critical habitat, the consulting agency must provide an Incidental Take Statement (ITS) which outlines any reasonable and prudent alternative measures (RPMs) with which the action agency must comply to ensure that the agency's action will not violate section 7(a)(2). Section 1536(b)(4); 402.14(i). Finally, section 7(d) prohibits the action agency from making any irreversible or irretrievable commitment of resources that would have the effect of foreclosing the formulation or implementation of any RPMs. 16 U.S.C. § 1536(d).

"Take" or "taking" of a species is defined as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect,

or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19) Generally, unauthorized take of species is prohibited. 16 U.S.C. § 1533(d) mandates that whenever any species is listed as threatened (pursuant to § 1533(c)), the Secretary shall issue regulations as necessary and advisable for the conservation of the species. Section 1533(d) states that the Secretary has the authority to prohibit by regulation, with respect to any threatened fish and wildlife species, any act prohibited by 16 U.S.C. § 1538(a)(1). Section 1538(a) prohibits taking any endangered species within the United States, and makes it unlawful to violate any regulation pertaining to and threatened species of fish and wildlife. 16 U.S.C. §§ 1533(a)(1)(B); 1533(a)(1)(G).

16 U.S.C. § 1540(g) authorizes citizen suits "to enjoin any person, including the United States or any other governmental agency [ ], who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof; ..." Section 1540(g)(1)(A). Plaintiffs's standing to file this suit is found under this subsection.

In 1993, the Mexican Spotted Owl (MSO) was listed as threatened with extinction pursuant to the ESA. On May 14, 1996, the United States Fish and Wildlife Service (FWS) issued a BiOp on forest plans [1] for 11 national forests in the Southwest Region of the United States Forest Service (FS), which concluded that implementation of the forest plans would jeopardize the continued existence of the MSO and would adversely modify the MSO's critical habitat. In 2004, the FS (as the action agency) requested from the FWS (as the consulting agency) reinitiation of

consultation of that BiOp, and on June 10, 2005 a new BiOp was issued. In this BiOp, the FWS concluded that there was anticipated take of the MSO, and that this level of take was not likely to result in jeopardy to the MSO. Due to the anticipated take and the conclusion that this level of take was not likely to result in jeopardy to the MSO, the FWS instituted three general RPMs in an ITS (pursuant to § 1536(b)(4)) to minimize impacts of the incidental take upon the MSO population. These RPMs were:

1. Protect MSOs on National Forest System lands;

2. Protect MSO habitat on National Forest System Lands;

3. Monitor MSO occupancy on National Forest System lands, pursuant to the most current approved MSO Recovery Plan.

The FS states that because of personnel and funding deficiencies, it has not been able to meet the monitoring requirement of the 2005 BiOp. The FS has "typically monitored 20–25% of Protected Activity Centers [the owl's habitat] during 2005–2007." CBD also states that the FS has likely exceeded the incidental take limits of the 2005 BiOp.

In 1978, the New Mexico ridge-nosed rattlesnake (RNR) was listed as a threatened species. In the 2005 BiOp, the FWS outlined three RPMs to minimize take of the RNR. These are:

1. Protect New Mexico ridge-nosed rattlesnakes on the Coronado NF (National Forest);

2. Protect New Mexico ridge-nosed rattlesnake habitat on the Coronado NF;

---

**1.** The National Forest Management Act directs the Secretary of Agriculture (via the appropriate agency) to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." 16 U.S.C. § 1604(a). Plans

to not typically execute or approve of projects and activities; nevertheless, activities within the regions covered by the forest plans must be consistent with the applicable standards and guidelines of the forest plan.

3. Monitor New Mexico ridge-nosed rattlesnakes habitat on the Coronado NF.

The FS is therefore required to monitor RNR habitat pursuant to RPM 3 of the 2005 BiOp. However, "the Forest Service states that budget limitations have precluded monitoring efforts." Because of the inherent difficulty in tracking the species, "the Forest Service is unable to determine whether or not it has exceeded the allowable take limit for the New Mexico ridge-nosed rattlesnake."

In its October 2008 Annual Report for the period of June 2005–June 2007, the FS admitted that it had not complied with the monitoring requirement of the third RPMs for various species under the 2005 BiOp because of a lack of resources. The FS requested reinitiation of consultation on April 17, 2009 to address this monitoring failure, but as of one year later the FWS had not responded to the request to reinitiate consultation. In April 2010 plaintiff Center for Biological Diversity (CBD) sent the FS and FWS (federal defendants or FD) notice of intent to file citizen suit pursuant to 16 U.S.C. § 1540(g) of the ESA. On June 22, 2010 the FWS responded to the FS' April 17, 2009 request for reinitiation of consultation for the MSO, stating that although it initially believed that reinitiation of consultation was unnecessary, it now believed that reinitiation was necessary, and started reinitiation as of June 22, 2010. On August 9, 2010, the FWS clarified in a letter to the FS that consultation was reinitiated for all species included in the 2005 BiOp, including the New Mexico ridge-nosed rattlesnake.

However, because of the FWS' alleged initial refusal to consult with the FS on a number of additional species, because of the FS' alleged failure to monitor a number of additional species (including the MSO and RNR), and because of the FS' alleged ongoing monitoring failures and alleged ESA violations, CBD filed this suit on July 20, 2010.

## STANDARD FOR RELIEF

■ By enacting the ESA, Congress altered the normal standards for injunctions under Federal Rule of Civil Procedure 65. The Ninth Circuit has consistently held that "[t]he traditional preliminary injunction analysis does not apply to injunctions issued pursuant to the ESA." *Nat'l Wildlife Fed'n v. NMFS*, 422 F.3d 782, 793 (9th Cir.2005). The Supreme Court stated that in enacting the ESA "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities." *TVA v. Hill*, 437 U.S. 153, 194, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). "Accordingly, courts may not use equity's scales to strike a different balance." *Nat'l Wildlife Fed'n*, 422 F.3d at 794 (internal quotation omitted).

■ The standards of review for injunctions under the ESA vary somewhat according to what type of violation is alleged: procedural or substantive. "The remedy for a substantial *procedural* violation of the ESA-a violation that is not technical or *de minimis-must* therefore be an injunction of the project pending compliance with the ESA." *Wash. Toxics Coalition*, 413 F.3d 1024, 1034 (9th Cir.2005) (upholding an injunction prohibiting the EPA from authorizing the use of certain pesticides within proscribed distances of salmon-bearing waters until it had fulfilled its consultation obligations under § 7(a)(2) of the ESA) (emphases added). To show they are entitled to a preliminary injunction due to a substantive violation of the ESA, Plaintiffs must "make a showing that a violation of the ESA is at least likely in the future." *Nat'l Wildlife Fed'n v. Burlington N.R.R., Inc.*, 23 F.3d 1508, 1511 (9th Cir.1994) (*Burlington N.R.R.*). What is required is "a definitive threat of future

harm to protected species, not mere speculation." *Id.* at 1512 n. 8. The Ninth Circuit has pointed out that "courts are not mechanically obligated to grant an injunction for every violation of law [,]" while at the same time noting that "[p]ast takings are [ ] instructive, especially if there is evidence that future similar takings are likely." *Id.* at 1512 (citing *TVA*, 437 U.S. at 173, 98 S.Ct. 2279; affirming district court's finding that future similar takings were not likely in that case).

## DISCUSSION

CBD alleges generally that because of the admitted failure of the FS to monitor, the FS does not know whether or not it has, could, or will exceed the incidental take limit set forth in the BiOp.[2] This failure to monitor constitutes a failure to conserve these species pursuant to section 7(a)(1) of the ESA. By failing to monitor, and by exceeding or not knowing whether it is exceeding the incidental take limit, the FS is failing to insure that implementation of forest plans in the FS' Southwest Region is not likely to jeopardize the existence of listed species pursuant to section 7(a)(2). Additionally, failure to monitor constitutes new information and a change to the proposed action that will affect these species in ways not considered in the BiOp, and the failure to immediately reinitiate and complete consultation regarding the implementation of forest plans also violates the ESA. 50 C.F.R. § 402.16. Finally, the FS is failing to comply with its non-discretionary obligations for threatened and endangered species in the Southwest Region under the ESA. 16 U.S.C. § 1540(g).

CBD notes that the FWS has determined that certain approved grazing allotments are reasonably certain to result in take of the RNR, and that the FWS has stated that take of the RNR is reasonably certain to occur as a result of implementation of the Coronado forest plan. While this, in and of itself, is not an ESA violation, the BiOp set forth a specific allowable incidental take limit, and because of the FS' failure to monitor, the FS is unable to determine whether or not the allowable incidental take limit has been exceeded. Additionally, because of the ongoing failure to monitor, the FS's decision to authorize grazing prior to reinitiation of consultation on forest plans violates the ESA, specifically 16 U.S.C. 1536 § (a)(2), (d); 16 U.S.C. § 1538(a)(1); 16 U.S.C. § 1533(d); 50 C.F.R. § 17.31.[3]

Because the FS stated on April 17, 2009 that it would likely soon exceed the allowable amount of incidental take for the MSO, and because of the FS' ongoing monitoring failures, the FS' allowance, authorization, and approval of projects[4] and activities that are likely to result in the take of the MSO prior to the completion of reinitiated consultation violates the ESA, specifically 16 U.S.C. 1536 § (a)(2), (d); 16 U.S.C. § 1538(a)(1); 16 U.S.C. § 1533(d); 50 C.F.R. § 17.31. Additionally, the FS has failed to prevent the irreversible and irretrievable commitment of resources that would foreclose implementation of reasonable and prudent measures in accordance with Section 7(d).[5]

---

2. Plaintiffs have established standing and the Court has previously ruled that the issues are not moot.

3. CBD also states that the FS' failure to consider a number of factors before issuing its September 17, 2009 determination for implementation of actions and activities in the Southwest Region means the action is therefore arbitrary and capricious and not in ac-

cordance with the ESA. 16 U.S.C. § 1536(d); 5 U.S.C. § 706(2).

4. CBD describes the Upper Beaver logging project (UBLP) as the principle project that will cause take of the MSO.

5. CBD states again that the FS' failure to consider a number of factors before issuing its September 17, 2009 determination for im-

FD argue that declaratory relief stating that they are not in compliance with the ESA is unnecessary, because they have already admitted that they have not been able to fully implement RPM 3 (monitoring) of the 2005 BiOp, which is the primary reason that consultation was reinitiated in the first place. According to FD, the only appropriate remedy for this violation would be for the Court to order the FD to reinitiate consultation in order to address the failure to monitor-yet the FD have already reinitiated consultation. It would be pointless and a waste of the Court's resources to issue declaratory relief to this effect when the failure has already been acknowledged and acted upon.

The FS states that it failed to monitor because it lacked the resources to fully implement RPM 3. FD have reinitiated consultation specifically to address this failure, but in the meantime the FS states that RPM 3 will be implemented to the fullest extent possible, and any sites for which there is no monitoring data are assumed to be occupied. Moreover, site specific consultation is taking place with every project authorized by the FS. Essentially, FD argue that an order compelling them to fully implement RPM 3 would be difficult (if not impossible) to comply with due to resource constraints. Furthermore, they argue that there have been no adverse consequences to the aforementioned species or habitats due to the failure to monitor, because the FS simply assumes sites where monitoring or consultation has not occurred to be occupied. Because any order compelling FD to comply with RPM 3 will not meaningfully change what the FS is currently doing or affect any listed species in any meaningful way, this order would not be an effective form of relief.

FD argue that, although they have not been able to fully comply with RPM 3, this is evidence neither of unlawful take nor of destruction or adverse modification of critical habitat such that these projects should be enjoined. In the December 16, 2010 letter reviewing the MSO take-tracking system, the FS states that it is apparent that the FS has not yet and will not exceed the level of take of the MSO anticipated in the 2005 BiOp. Moreover, the grazing allotments and logging project which CBD seeks to enjoin have undergone site-specific ESA consultation and have had their own BiOps issued (which have not been specifically challenged by CBD). CBD can point to no specific unlawful take that has occurred such that these projects should be enjoined by the Court, only a general failure to monitor under the original 2005 BiOp.

FD argue that injunctive relief is a "drastic and extraordinary" measure, and unwarranted for the current violations that CBD alleges. Furthermore, FD state that courts are not required to issue an injunction for every violation of the law. Rather, they allege, to justify such relief Plaintiffs must point to some type of irreparable injury or harm, which may not be presumed or be merely possible, but instead must be demonstrated by actual evidence. Moreover, this injunctive relief would not have any meaningful effect, because Plaintiffs can show no ESA violation that has occurred as a result of authorization of these projects-in other words, no violation that the injunctive relief would actually cure. FD have not exceeded the limits of incidental take allowed under the 2005 BiOp, and Plaintiffs have offered no evidence of jeopardy (outside of mere allegations and the FS' own language) to any

plementation of actions and activities in the Southwest Region means the action is therefore arbitrary and capricious and not in ac-

cordance with the ESA. 16 U.S.C. § 1536(d); 5 U.S.C. § 706(2).

listed species or destruction or adverse modification of any critical habitat. Therefore, enjoining the grazing projects and Upper Beaver logging project would be inappropriate.

The First Claim in CBD's Amended Complaint is that the FS has violated 16 U.S.C. § 1536(a)(1) and (a)(2) of the ESA. Specifically, CBD alleges that by failing to comply with the mandatory monitoring requirements of the 2005 BiOp:

1. The FS is failing to conserve threatened species as required by § 7(a)(1);

2. The FS is failing to insure that the implementation of the forest plans is not likely to jeopardize listed species, as required by § 7(a)(2) (for actions authorized by agencies);

3. This constitutes new information and a change to the proposed action not considered in the 2005 BiOp, and the FS's failure to immediately reinitiate consultation violates 50 C.F.R. § 402.16;

4. The FS is failing to comply with its non-discretionary obligations with respect to the named threatened and endangered species.

CBD is asking for declaratory relief that the FS failed to implement RPM 3 of the 2005 BiOp, as well as an order that the FS immediately begin to comply with the 2005 BiOp. The FS has already acknowledged a failure to monitor, but a declaratory judgment that it is in violation of the 2005 BiOp might still provide CBD some relief, as a legal authority ensuring that FD completed reinitiated consultation in a timely manner. CBD has also asked for an order compelling the FS to immediately begin complying with the 2005 BiOp. While the FS has stated this order would be difficult, if not impossible, to comply with, it is unclear how this stated inability of the FS to comply with the prospective order immediately moots CBD's claim under the "meaningful relief" standard. At the very least, even if complete monitoring is not

possible, increased monitoring of the species at issue in this case would seem to remedy some of the alleged violations on the part of the FD, as well as determine whether or not incidental take of these species is truly occurring, as CBD alleges in its Complaint.

The 2005 BiOp has not-as yet-been superseded; the FD are in the process of consulting for the new BiOp, a process that will take an indeterminate amount of time. FD assert that this new BiOp will be complete in a matter of months, most likely before litigation is completed. This may be true, and if this happens some or all of CBD's claims may be mooted, but until such time as the new BiOp is implemented, the 2005 BiOp is the controlling legal authority for the FS with respect to its protection of the species at issue in this case.

Notwithstanding the fact that the 2005 BiOp has not yet been superseded, the FD argue that CBD's claims are nevertheless moot because the Court still cannot grant any effective relief. In *Southwest Ctr. for Biological Diversity v. U.S. Forest Serv.,* the court refused to grant a declaratory judgment to the plaintiff that the defendant was in violation of the ESA, or order the FS to engage in consultation, because the FS had already acknowledged that it was in violation of the ESA and had already reinitiated consultation. 82 F.Supp.2d 1070, 1079 (D.Ariz.2000). However, in that case there was literally no other relief that could be granted to plaintiffs. "Southwest Center [sought] a declaratory judgment that the Forest Service ha[d] failed to fulfill its obligation to consult ..." *Id.* at 1071. Because all Southwest Center sought was reinitiation of consultation, and because consultation had already been reinitiated, the Court felt there was no other relief that it could grant. In *Southern Utah Wilderness Alli-*

*ance v. Smith,* the court likewise held that a declaratory judgment would serve no purpose because the only relief plaintiffs sought was reinitiation of consultation, but the defendants had already reinitiated consultation. 110 F.3d 724, 729 (10th Cir. 1997). However, the court also specifically stated:

> This is not to say that a violation of section 7(a)(2) could always be cured by subsequent consultation, nor is this general approval for consultation after the fact. Instead, this merely recognizes that the changed circumstances of *this particular case* no longer present an opportunity for meaningful relief.

*Id.* (emphasis added).

█ Here, CBD seeks both a declaratory judgment that the FS was in violation of the ESA and an order compelling the FS to begin complying with the 2005 BiOp. Just because consultation has been reinitiated, "that is not the only form of effective relief that … the district court may grant." *Forest Guardians v. Johanns,* 450 F.3d 455, 462 (9th Cir.2006). A declaratory judgment that the FS' actions violated the ESA "would provide effective relief by governing the Forest Service's actions … and by prohibiting it from continuing to violate the law." *Id.* at 462–63. Most importantly, because *"relief remains available* to [plaintiffs] notwithstanding the Forest Service's re-initiation of consultation …, the agency has failed to carry its burden to establish mootness." *Id.* (emphasis added). The court in *Johanns* found that granting a declaratory judgment that the FS' actions violated the ESA was an effective form of relief that was available to be granted.

FD seem to be saying that any order compelling them to comply with the 2005 BiOp is alternatively impossible or unnecessary. The FS first argues that, from an economic standpoint, it is a waste of resources for the Court to order it to do

something (follow the terms of the 2005 BiOp) that it will no longer be required to do in a few months anyway (because the new BiOp will supersede the old one). FD argument appears to be a catch-all: "Although no case specifically holds for our position, do not rule in favor of plaintiffs because it makes little economic or judicial sense." Nevertheless, there are remedies that the Court can order in this instance.

FD argue that because they have either monitored the appropriate sites, initiated site-specific consultation where necessary, or acted as though unmonitored sites are already occupied by the species at issue when approving activities, any order compelling them to fulfill the terms of the monitoring requirement will not be an effective form of relief. Nevertheless, as CBD alleges, the FS has "not conducted any surveys or monitoring for the New Mexico ridge-nosed rattlesnake since the issuance of the 2005 Biological Opinion." CBD goes on to say that the FS is unable to determine whether or not the incidental take limit has been exceeded for the proposed grazing allotment areas. Similarly, the FS stated on April 17, 2009 that it would "likely soon exceed the amount of allowable incidental take for the Mexican spotted owl." Additionally, the FWS has determined that the UBLP "is reasonably certain to result in the take of the Mexican spotted owl." CBD alleges that because of a failure to monitor in both cases, the FS has no idea whether or not it will exceed the amount of allowable take for both animals. FD argue that they are well within the take limits for both animals.

█ In sum, here FD have not met their heavy burden of establishing that there is no effective relief the court could provide. The Third Claim in CBD's Amended Complaint is that the FS' continued authorization of certain allotments of livestock grazing violates the ESA, specifi-

cally § 1536(a)(2) (jeopardize listed species), § 1538(a)(1) (take species or violate regulation), § 1533(d) (prohibited acts), and 50 C.F.R. § 17.31 (taking of threatened or endangered species). CBD alleges in its complaint that, based on the FS's own admissions, take of the RNR either has occurred or is likely to occur because of the grazing allotments. The FS answered that it was within the take limit, but it again argued that, because authority for these allotments was granted under a BiOp that will soon be superseded, CBD's claims that the ESA was violated in authorizing these allotments is moot either way. However, FD must show that an injunction would not be a form of effective relief.

Because CBD is asking for an injunction against these projects, FD allege that they would have to demonstrate that "irreparable injury is *likely* in the absence of an injunction." *Winter v. NRDC*, 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). However, *Sierra Club v. Marsh* explicitly held that this test

> is not the test for injunctions under the Endangered Species Act. In *TVA v. Hill*, 437 U.S. 153, 173, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (internal citations omitted), the Supreme Court held that Congress had explicitly foreclosed the exercise of traditional equitable discretion by courts faced with a violation of section 7 of the ESA. * * * Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as "institutionalized caution."

816 F.2d 1376, 1383 (9th Cir.1987).

As CBD argues, "Requiring the Center to further 'prove' irreparable harm to the imperiled rattlesnake under these circumstances would only reward the agency's own monitoring failures." Furthermore, "It is not the responsibility of the plaintiffs to prove, nor the function of the courts to judge, the effect of a proposed action on an endangered species when the proper procedures have not been followed." *Thomas v. Peterson*, 753 F.2d 754, 765 (9th Cir. 1985).

FD have called the injunctive relief a "drastic and extraordinary" measure. CBD, for its part, states that it has only requested what "is recommended in the FWS' 2002 Biological Opinion—that the livestock grazing be limited on these [ ] grazing allotments to only the winter season." Additionally, enjoining grazing permits is generally an appropriate form of relief for plaintiffs while compliance with the ESA is pending. *See Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1053 (9th Cir.1994).

■ The Fourth Claim in CBD's Amended Complaint is that the FS' allowance, authorization, and approval of projects and activities in national forests that are likely to result in take of the MSO, prior to the completion of reinitiated consultation of certain allotments of livestock grazing, violates the ESA, specifically § 1536(a)(2) (jeopardize listed species), § 1536(d) (irreversible and irretrievable commitment of resources), § 1538(a)(1) (take species or violate regulation), § 1533(d) (prohibited acts), and 50 C.F.R. § 17.31 (taking of threatened or endangered species).

The FS again maintains that because the 2005 BiOp under which this logging was approved will be superseded. The distinctions here are that the FS stated that it would soon exceed the amount of allowable take for the MSO, that the FS determined that the UBLP was reasonably certain to result in take of the MSO, and that the FS has failed to prevent the irreversible and irretrievable commitment of

resources with respect to implementations of forest plans in the Southwest Region.

CBD is asking for an injunction against the UBLP. CBD again maintains that it is not requesting "drastic" relief, but "simply requests reasonable interim relief ... For instance, [CBD] requests that logging be prohibited near the owl's 'Protected Activity Centers' during the breeding season, which is what the FWS determined would result in the taking of this species." Additionally, courts in the Ninth Circuit have ruled that timber harvest activities constitute a *per se* irreversible and irretrievable commitment of resources under section 7(d).

Section 7(d) prevents agencies or their permit or license applicants, after reinitiation of consultation, from making any irreversible or irretrievable commitment of resources that would have the effect of foreclosing formulation or implementation of any RPMs which would not violate section 7(a)(2). 16 U.S.C. § 1536(d). The UBLP harvests timber, authorizing 11,740 acres of logging within the habitat of the MSO. As such, it constitutes a *"per se* irreversible and irretrievable commitment of resources under section 7(d) and cannot go forward during the consultation period." *Silver v. Babbitt,* 924 F.Supp. 976, 988 (D.Ariz.1995). The court in *Silver* went even further, stating that these types of ongoing activities *"must be enjoined* under Ninth Circuit law until consultation ... is complete." 924 F.Supp. at 989 (emphasis added).

FD argue that this claim is without merit because CBD cannot show that the "requested interim injunctive relief is necessary to prevent irreparable harm." However, the standard for this injunction is somewhat different. First, FD mistakenly applied the "irreparable harm" injunctive relief standard of *Winter v. NRDC,* as opposed to the "institutionalized caution" standard of *Sierra Club v.*

*Marsh* (and *TVA v. Hill*). Second, CBD has the authority, under 1538(g), to file citizen suits for violations of the ESA. Here, FD have violated section 7(d) by making an irreversible and irretrievable commitment of resources during reinitiated consultation. Not only is the injunction that CBD has requested an effective form of relief, it is based in Ninth Circuit precedent, the most appropriate form of relief for the 7(d) violation in question.

## CONCLUSION

CBD has asserted three claims, which FD argue are all without merit and evidentiary support in the administrative record. Admittedly, authorities are split on whether or not CBD's First Claim—that the FS violated the ESA—is lacking in merit when the FS has already admitted the violation and reinitiated consultation. However, there is relief available to CBD based on its specifically identifiable problems that are directly related to the FS ability to monitor "take." Consequently, the Court does not consider this an advisory opinion, but a method of ensuring that reinitiated consultation is completed as soon as possible and that specifically identified harmful activities are preliminarily curtailed until such time. CBD's Third Claim asserts that the FS has violated the ESA by permitting livestock grazing permits, and claims that take of the RNR will occur as a result of this livestock grazing. Relief is available to CBD in the form of a preliminary injunction against the livestock grazing during the winter months. Finally, CBD's asserts in its Fourth Claim that the FS has violated the ESA by permitting the Upper Beaver logging project. Based on Ninth Circuit case law, authorization of the logging project during reinitiated consultation is almost assuredly a section 7(d) violation, and as such the Court is well within its authority to issue the preliminary injunction against the project.

Under the circumstances, despite the government agencies' best efforts to fulfill and comply with the statutory requirements they operate under, the targeted relief requested by Plaintiffs is rational to ensure the ongoing existence of certain listed endangered species.

Accordingly,

IT IS ORDERED that Plaintiffs' motion (Doc. 39) is GRANTED, as follows:

1. The Court preliminarily enjoins the Upper Beaver logging projects immediately adjacent to the Mexican spotted owl protected activity centers pending the completion of consultation. AR 110 at 16.

2. The Court preliminarily enjoins all livestock grazing on the four allotments that have been identified by FWS as "reasonably certain" to take the New Mexico ridge-nosed rattlesnake only during the months that the rattlesnake is likely to be present, as recommended by a scientific study within FWS's biological opinion. AR 183 at 36.

3. The Defendants may move for dissolution of this Order if and when it deems appropriate.

4. The Court will address attorney fees and costs when this action is completely resolved.

5. The parties shall file a joint report on the status of this action on or before March 31, 2012.